JAY SWEGLE, Appellee, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY et al., Appellants.

**EVIDENCE:** Documentary Evidence—Life Tables. Life tables are admissible on the contested issue whether the injuries sustained by an injured party were permanent.

**TRIAL:** Instructions—Belated Exceptions. Exceptions to instructions will not be considered when filed after the time provided by statute.

**RAILROADS:** Accidents at Crossings—Contributory Negligence. The fact that the team which a party was driving was spirited, and that one of the horses was blind and required constant attention in order to avoid dangerous conditions along the roadside, coupled with the absence of all warning signals from an approaching train, may demonstrate that the issue of negligence on the part of the driver was for the jury.

*Appeal from Clarke District Court.*—HOMER A. FULLER, Judge.

APRIL 3, 1923.

REHEARING DENIED SEPTEMBER 22, 1923.

ACTION to recover damages for personal injury and for damages to a team, harness, and wagon, sustained at a railroad crossing, and resulting from collision of plaintiff's team with one of the passenger trains of defendant company. The case was submitted to a jury, and a verdict was returned in favor of plaintiff for $10,000. Judgment was entered on the verdict. Defendants appeal.—*Affirmed.*

*McGinnis & McGinnis, Crist & Dyer, Palmer Trimble,* and *H. J. Nelson,* for appellants.

*O. M. Slaymaker, A. M. Miller,* and *C. W. Hoffman,* for appellee.

ARTHUR, J.—Plaintiff lived on a farm about two and one-half miles southwest of Grand River, and about a mile west of the crossing on which the accident occurred. On the day of the injury, plaintiff left home about 2:25 P. M., driving a team and empty wagon, going to Grand River on a business errand. He was driving a wooden-wheeled wagon, with ordinary lower box, and was sitting on a homemade seat. He was driving a team, one blind mare 7 years old and a horse 5 years old, weighing about 1,250 or 1,300 pounds each. The team was being driven at about two or two and one-half miles an hour, at an ordinary walk. It was a chilly March day, wind blowing quite hard, ground frozen, roads smooth. Plaintiff was dressed in overalls, ducking coat, and winter cap. At the time plaintiff approached the crossing, he was sitting on the right side of the seat, driving the team. Plaintiff reached the crossing at about 2:40 P. M., and in going over the railroad track, was struck by a train running east, or rather, northeast, and suffered personal injury; and one of the horses was killed, and the wagon and the harness were destroyed.

The general direction of the railroad across the state is east and west; but at the crossing in question, and for some mile on either side, the railroad track extends from southwest to northeast. The highway in question crosses the railroad right of way about a mile and a half southwest (west, as it is called in railroading) of the station of Grand River, in Decatur County, Iowa.

I.  Plaintiff testified, in substance, that he was born in December, 1890; that he had lived with his parents all his life, on his father's farm; that his occupation had always been farming; that his schooling was to the eighth grade; that he had never had any serious illness, prior to the time of the accident and his injury on March 6, 1920; that his health had always been good up to that time; that, during the nine years last past, he had lived with his father on a 165-acre farm located two and one-half miles southwest of Grand River; that, in going from the farm to Grand River, they go north first, half a mile, then east a mile, north a half mile, and then east a half mile into Grand River; that the residence on his father's farm was about 35 rods south of the railroad track; that he was familiar with the schedule of the trains on the road in question; that, at the time, two passenger trains went east and two west, and a freight train went in each direction each day; that the first east-bound passenger train was due in Grand River at 2:33 P. M., and that was the train he collided with; that said train goes by his home at from 2:28 to 2:30 P. M.; that the train that struck him, the east-bound train which passes his house at from 2:20 to 2:30, and reaches Grand River at 2:33 P. M., was seldom late,—perhaps would be late once in three months; that the track is down-grade, beginning about a quarter of a mile southwest, sloping towards the crossing where he was struck; that, the day he was injured, he was driving a team and wagon,—had started to Grand River on a business errand; that the wagon was empty; that he left home at about 2:25 P. M.; that, if the train that struck him had been running on time, it should have passed his home at 2:28 to 2:30, and that he started from home from 3 to 5 minutes ahead of the train time of passing his home; that he was driving a low wooden-wheeled wagon, with just a lower box, and with a homemade seat with straight sides, about 8 inches high,—the back a little higher; that the wagon was solid, and there was nothing to rattle about it; that the railroad runs through their farm, and they have fields on both sides of the track; that the blind mare he was driving noticed trains; that, when a whistle is blown or bell rung, she will prick up her ears and jump and throw her head more than an ordinary horse; that he never noticed a train pass when the mare was within

hearing distance of it that she did not give some indication of hearing it; that, when he was driving this mare and her mate, he had to hold them and watch them a great deal, to keep them in the road; that the mare did not keep the road well; that, on the day and trip in question, as he was driving alone, he had his feet braced against the end gate, to hold the team; that, if he did not keep a tight line, the mare would go into ditches that were on the side of the road; that he had to watch his team closely, on account of the ditches by the road; that the horse was hard-mouthed, always riding the bits; that he was driving at about two and one-half miles an hour,—just an ordinary walk; that he kept a tight rein on the team all the time; that, about half a mile west of the crossing, Floyd Russell, a neighbor boy, got into the wagon and rode with him, sitting with him on the north side of the seat; that, when he was about a half a mile west of the crossing, he thought he heard the whistle of the passenger train for the crossing at his home; that, if it had been the train whistling at such crossing, the train would have passed the crossing where he was struck and would have been at Grand River by the time he reached the crossing; that Mr. Davis lived three or four hundred feet west of the crossing; that the Davis buildings are on an elevation considerably higher than the crossing; that the road runs east and west at the Davis place; that from the Davis place you go down a steep hill; that there is a hedge fence clear along on the south side of the road as you go east from the Davis house,—part of it is 20 feet high, and the trees are about a foot to 3 feet apart, and from 3 to 5 inches in diameter; that west of the high hedge there is a lower hedge, perhaps 5 or 6 feet high; that the road east from the Davis place is graded so that there is a bank on the south side, about 6 feet high, for a short distance; that the hedge fence extends east to within 94 feet of the center of the railroad track; that the east end of the hedge fence is about 10 or 12 feet from the railroad right-of-way fence; that the weeds on the right of way had not been cut or burned; that there is a deep, long cut through which the track passes, the north end of which is about 1,400 feet southwest of the crossing in question; that, when he reached the east end of the hedge fence, he believed that the train which afterwards struck him had passed

over the crossing; that, beginning at the east end of the hedge fence, the wagon road runs angling to the northeast, on account of quite an elevation on the east side of the track, and also on the west side, which is cut through for the railroad track; that, if you were crossing directly east of the east end of the hedge fence, there would be a rise to go up onto the track, of about 10 or 11 feet, and that about the same elevation exists on the east side of the track; that the highway detoured to the northeast, to avoid the elevations mentioned; that it is approximately 150 feet from the center of the road at the east end of the hedge fence to the crossing; that, after passing the east end of the hedge a short distance, the traveled highway runs northeast to the crossing, and then turns directly east across the track, and then angles southeast to the road running on straight east; that the hill on which the Davis house stands extends to the north, and about 7 rods from the Davis house, angles to the northeast, and then extends nearly straight east; that the wind was blowing hard, and, after he had gone down the hill from the Davis house into the hollow, there was the hill north and west of him, so that the wind was not noticeable,—the wind being from the northwest that day; that the whistling post south of the crossing is about 1,181 feet from the crossing; that he knew that there was a whistling post there, and knew that trains were required to give whistling signals at that post, and knew that trains were required to ring bells from the time of whistling until they had passed the crossing, and supposed that the railroad company did give those signals, and never had observed any omission to give the signals until the time in question; that right west of the Davis house is practically the first place he could look, to see any trains; that at that point he looked, and there was no train in sight; that he next looked at the east end of the hedge, which was practically the only view he could have until he got to that point, after passing the point before mentioned, west of the Davis house; that, at this point, at the east end of the hedge, he held up his team, so that they would not make any noise, and looked and listened for a train, and did not see or hear a train; that from this point he could see a train possibly 1,100 feet southwest; that from this point he drove at a slow walk; that from this point it takes about two thirds of a minute, at the

rate he was driving, to reach the crossing; that from this point, the east end of the hedge, he moved on, and when about halfway to the crossing, he looked and listened again, but did not stop his team; that at this point he could see about 1,200 feet to the south, and that there was no train in sight; that at this point he could have heard the crossing whistle, if one had been sounded, and could have heard the bell, if it had been rung; that he looked again after that, at a point 35 to 40 feet from the crossing, and at that time, the way he was wrapped up, ''driving right with the train at that time, I couldn't look back over 300 or 400 feet. There was no train in sight over that distance. The reason I couldn't look any further back than that was that I had my arms braced back, holding the team. They were riding the bits at that time. My coat collar would bother me some in looking around. I was driving about the same direction the track was running. There was not any train within that distance of 300 or 400 feet that I could see. I was positive that that passenger train did not whistle for that crossing that day. I was listening for it. We boys were not talking as we went along there. I had my mind on looking for that train,—looking for trains from the other direction, too. I would say that it took 10 seconds, at least, for the team to drive from this point where I looked until it was on the railroad track. At this place, where I last looked, I was just coming into the ditch,—right about the side of it. At that time, there was occasion to give the horses special attention, because the blind one would crowd to the road or push against the other horse. I turned as far as I could, under the circumstances, at that time and place. I have observed the speed that those trains run down that grade there, and will say they come down there from 45 to 50 miles an hour.''

Plaintiff testified that it was 2:45 or 2:50 in the afternoon when he was struck by the train; that the time of the train to cross that crossing was about 2:30; that the train was from 15 to 20 minutes late; that no signals were given; that his horses gave no indication of there being a train; that the blind mare gave no indication of a train's being close; that there was no noise of any steam escaping; that he did not know that the train was approaching at all; that he was thinking and listening and watching for a train all of the time from the time he left the

east end of the hedge; that, a couple of weeks before, he had approached the same crossing from the west, when the wind was blowing about the same as it was on the day of the accident, and that on that occasion he had heard the train, and had heard the whistle and the ringing of the bell; that there is a private crossing, called the Davis crossing, right north of the whistling post, and that there were weeds there that obstructed his view on that day; that he could stop the team he was driving within two or three feet; and that, if any signal had been given for the crossing, he could have stopped his team in that distance.

A number of witnesses who were riding on the train testified that no whistle was sounded for the crossing and no bell rung.

It is conceded by defendant that no bell was rung. Witnesses testified that it was 750 feet north of the crossing to the front end of the engine where the train was stopped after the accident.

The engineer, F. E. Dolf, on the train in question, who is also sued in this action, testified that his train was late that day; that the train was running somewhere from 25 to 30 miles an hour,—not to exceed 30; that it was down grade from the top of the hill in a deep cut situated about 1,400 feet south of the crossing in question, and that from there on to the crossing, the train coasted down the grade, with the steam shut off; that the whistle was sounded at the whistling post south of the crossing; that the bell was not rung because the automatic air service was out of repair; that, after the train left the cut and was coasting down the hill toward the crossing, the fireman was tending to the fire, and not keeping a lookout; that the train, consisting of two coaches and a baggage car, was being drawn by a small engine; that, after the train passes through the cut into the open, from his side of the engine,—the right side, the east side,—he could see about a quarter of a mile to the north; that he could not see much after he got down within 500 feet of the crossing; that he could see "about as much, if a team would be going across, in time to warn them;" that, when he got within 250 feet of the crossing, he could not see a team approaching from the west toward the crossing; that, at 500 feet south of the crossing, a team would have to be pretty well up toward the

crossing before he could see it; that he was keeping watch that day for anyone that might be approaching the crossing; that it was a bad day, and he was watching closely; that there was no team in sight when he came in sight of the crossing; that the first he knew of anyone on the track was by a slight jar of the engine when the collision occurred.

Defendant offered testimony of a civil engineer and his assistants, who made survey and plat of such survey of the crossing where the accident occurred, and of the right of way and lands adjoining, showing the hedge fence mentioned in evidence, and conditions existing at the crossing, and elevations showing grades and certain measurements and data as to the view of a train from different points where plaintiff claimed to have looked for a train. The testimony of the witnesses and the plat tended to show that, from the east end of the hedge approximately 150 feet southwest of the highway crossing in question, a train could be seen standing on the track 1,680 feet south of the crossing; that, at a point 200 feet from the crossing, looking through the hedge fence, a train could be seen on the track 1,282 feet south of the crossing. The levels taken show the elevation at the point 1,680 feet south of the crossing to be 16.41 feet higher than at the crossing; at a point 1,282 feet south of the crossing, 14 feet higher than at the crossing; at a point 800 feet south of the crossing, 8½ feet higher; at a point 500 feet, 4.41 feet higher; at a point 200 feet, 1 foot and 1 inch higher than at the crossing; and at a point 1,000 feet south of the crossing, 11½ feet higher than at the crossing.

II. At the close of plaintiff's testimony, defendants moved the court to direct a verdict in their favor, upon grounds, in substance:

(1)   That the testimony showed that plaintiff was familiar with the crossing and its surroundings, the trains which traversed the road daily, the times of arrival and departure at the town of Grand River, their time at his home, and the crossing in question, and particularly, the train that struck him; that he was familiar with the speed of the train on the grade from the cut south of the crossing to the crossing, and knew about the dangers incident to and surrounding the crossing; and that plaintiff was guilty of contributory negligence, for, no matter

what the acts and conduct of the defendants were, his own negligence in failing to exercise ordinary care, such as is required of individuals in crossing a railroad, contributed to his own injury in such a way as would prevent his recovery.

(2)   That the physical facts surrounding the crossing in question and the railroad track, as shown by the testimony of plaintiff himself and the plat and measurements in evidence and photographs, were of such a character that the plaintiff, although he claimed to have looked and listened, if he had done so must have seen the approaching train; and that, if he failed to do so, he was guilty of contributory negligence.

(3)   That the testimony on the part of plaintiff shows that he checked the speed of his team at the east end of the hedge fence, about 150 feet from the crossing, and looked and listened for trains, from which point he could see some 1,200 feet south on the track from the crossing; that plaintiff claims that no train was approaching, and he then proceeded to a point about halfway between this latter point and the crossing, at which point he again looked and listened, and saw no train coming; that again plaintiff looked and listened, when within 35 or 40 feet from the crossing, and saw no train approaching.

(4)   That, at the point where plaintiff claims he last looked and listened for a train, about 35 or 40 feet from the crossing, there was no emergency such as would justify him in diverting his attention in any way from fully looking and listening, so far as his sight and hearing would permit him to determine whether or not there was a train approaching; that the diverting circumstances testified to by plaintiff, that the team he was driving was pressing on the bits, and the blind mare was crowding the other horse, and plaintiff's claim that, to manage the team, he had to sit with his feet braced, and keep a tight rein on the team, and give much attention to the team at that point, and that he could not turn entirely around for that reason, and look as far down the track as he possibly might, when, under the circumstances, as he claimed, he could turn only far enough around to see 300 or 400 feet down the track,—that such contention on the part of plaintiff was not an emergency to justify plaintiff in failing to look and listen to the fullest extent of his faculties of sight and hearing at this point.

(5)   That the conduct of plaintiff, with his knowledge of the physical facts surrounding the crossing and railroad track, is of such a character that all reasonable minds would have to come to the same conclusion in determining these facts, and that is, that the plaintiff himself contributed to his own injury by his failure to exercise ordinary care, and is, therefore, precluded from any recovery in this case.

(6)   That the testimony shows that, at the last point where plaintiff claims to have looked and listened, 35 or 40 feet from the crossing, if he had been in condition to and was exercising his sense of hearing, he must have heard the approaching train, and that he was guilty of negligence in not exercising ordinary care to determine that fact.

(7)   That the testimony shows that plaintiff was familiar with the habit of the train in question, in running down the grade to the crossing, and with such knowledge, plaintiff failed to exercise such care as a person of ordinary prudence would be expected and required to exercise under like circumstances.

(8)   That the testimony of plaintiff shows such contributory negligence on his part that, no matter what the conduct of the defendant and its employees may have been, plaintiff's negligence and lack of exercise of ordinary care, amounting to contributory negligence, would prevent his recovery.

The motion made at the close of plaintiff's testimony was overruled, and defendants introduced their testimony, and plaintiff introduced some testimony in rebuttal.

III.   At the close of all the testimony, defendants renewed their motion made at the close of plaintiff's testimony, and as additional grounds, emphasized the physical-fact situation, urging that the evidence both on the part of plaintiff and defendants showed, without dispute, all the physical facts surrounding the crossing to be of such a character that the plaintiff, in the exercise of ordinary care, such as was required of him in approaching the crossing in question, if he had exercised the care required of him by law and used his senses of sight and hearing, would have seen the approaching train and avoided the accident of which he complains; that the evidence clearly showed that the train was within seeing and hearing distance of the plaintiff before and at the time that he approached the crossing; that,

if he had exercised the ordinary care required of him to look and listen, he would have seen the train and avoided the accident; and that on account thereof there was no conflict in the testimony such as would justify the submission of the case to the jury.

This motion for directed verdict was also overruled.

IV.   Certain assignments of error may be disposed of before going to the consideration of the vital question upon which the case must be determined: the question of contributory negligence of plaintiff.

Defendants complain that it was error to admit in evidence the life tables.   There was conflict in the evidence as to whether the injuries sustained by plaintiff were permanent, and, under such situation, it was not error to receive the mortality tables in evidence, proper instructions being given as to their effect.   *Ronn v. City of Des Moines,* 78 Iowa 63.

1. EVIDENCE: documentary evidence: life tables.

V.   Errors are claimed in the instructions.   Exceptions to instructions were not made in time to be considered.   The verdict was returned on March 26, 1921, and defendants were given until April 16th following, within which to file a motion in arrest of judgment and for new trial.   No additional time was asked or given in which to file exceptions to instructions, and the exceptions to instructions were not filed within the five days allowed by statute, and were not filed until the 16th of April.   Section 3709, Code of 1897, as amended by Chapter 11, Acts of the Thirty-eighth General Assembly; *Haman v. Preston,* 186 Iowa 1292; *Crow v. Casady,* 191 Iowa 1357.

2. TRIAL: instructions: belated exceptions.

Complaint is also made that the verdict was excessive, which complaint will be hereinafter considered.

VI.   The question of contributory negligence was raised in various forms in both motions for a directed verdict and in the motion for a new trial.   It is to this issue that the arguments of counsel are largely devoted.   It is not seriously contended, and may not be, that defendants were not negligent.   It is admitted by defendants that the bell was not rung for the crossing.   Viewing the evidence, as it must be viewed, on consideration of the

3. RAILROADS: accidents at crossings: contributory negligence.

motions, in the most favorable light for plaintiff, it must be said that the whistle for the crossing was not sounded.

Defendants strenuously and ably argue that it is demonstrated from the physical-fact situation that plaintiff was guilty of contributory negligence as a matter of law, and that consequently no issue was presented for the consideration of the jury. Counsel for appellants cite many cases in support of such position, and counsel for appellee cite numerous cases in support of their contention that the evidence did not establish contributory negligence on the part of the plaintiff as a matter of law, and that the case was properly submitted to the jury.

The question of contributory negligence in actions involving collisions between a train and a vehicle on a railroad crossing has frequently been before the courts. The principles and rules of law announced in the cases cited are not in conflict. The difficulty lies in applying the well settled rules to the facts of this case or any particular case. It has been many times said by the courts, in substance and effect, that, under all ordinary circumstances, negligence is a question for the jury, and that it is only in plain cases that the court is justified in holding, as a matter of law, that one injured at a railway crossing is guilty of negligence. The exception to the rule is where the undisputed facts are such that all reasonable persons must draw the same conclusion from them. The trial judge cannot rightfully control or direct the verdict if other fair-minded, intelligent persons, considering the same evidence, may believe that the plaintiff's conduct was not inconsistent with the rule of reasonable care. It is not our province to weigh and consider all the evidence and determine therefrom whether or not the plaintiff failed to exercise ordinary care, but the question presented to us is whether it is established by the evidence, as a matter of law, that appellee was guilty of contributory negligence: that is, whether or not all fair-minded persons, considering the evidence, would agree on the issue of contributory negligence.

Appellants strongly urge that the testimony of their witnesses and the plat and photographs produced in evidence demonstrate and establish that, at a point at the east end of the hedge fence, where appellee says he checked his team and looked, he had an unobstructed view of the track, and could

have seen a train thereon approaching the crossing some 1,680 feet southwest of the crossing; and that, at a point 200 feet west of the crossing, a person looking through the hedge fence could have seen a train 1,280 feet from the crossing.

Appellants also urge that it is shown by the testimony of appellee himself that, when he checked his team at the east end of the hedge, he could see 1,100 feet to the southwest along the track; that, when he next looked, at a point about halfway from the end of the hedge fence to the crossing, he could see 1,200 feet southwest on the track; and that, farther on, when appellee last looked, 35 or 40 feet from the crossing, if he had turned clear around and looked, he could have seen clear to the cut. It is the contention of appellants that, no matter if appellee claims that there was no train in sight when he looked, the physical facts conclusively contradict him, and prove that, if he looked, as he claimed, he must have seen the train, and that, if he did not see the train, it was because he did not look; and that appellee was guilty of contributory negligence, as a matter of law, because, if he did look, he would have seen the train, and if he did not look, he was guilty of contributory negligence in not seeing the train. The physical-fact proposition urged by counsel for appellants has been discussed by the courts in many cases. Some of them are: *Crawford v. Chicago G. W. R. Co.,* 109 Iowa 433; *Beemer v. Chicago, R. I. & P. R. Co.,* 181 Iowa 642; *Reynolds v. Inter-Urban R. Co.,* 191 Iowa 589.

It may be pertinent to observe that the testimony of appellee, Swegle, and that of the engineer on the train, Dolf, present a rather anomalous situation. Appellee says that he looked at three different points, and did not see the train. The engineer says that he was keeping watch that day for anyone who might be approaching the crossing; that, when he was 500 feet from the crossing, he could see a team when it was "pretty well up toward the crossing;" and that he did not see the team. So we have a situation where it appears that appellee could have seen the train when he was near the crossing, and the engineer could have seen the team when it was near the crossing, and appellee did not see the train, according to his testimony, and the engineer did not see the team, according to his testimony.

Now, must the case before us be controlled by the physical-

fact proposition, and it be held that it clearly appears, as a matter of law, that appellee failed to exercise ordinary care; or, under the facts and circumstances, is it a debatable question, and one that fair-minded men will fail to agree upon?

The road from where appellee turned onto the right of way to the crossing angled to the northeast in the same direction that the train which struck appellee was moving. He was driving on an embankment, with a depression at the side of the road, that appellee claims was sufficient to upset his wagon if his team had surged off into it. Appellee excuses himself for not turning his head around enough to see a train approaching from the west as far as to the cut, by saying that the blind mare was crowding the other horse, and that the team was riding stiffly on the bit, and that it was necessary for him to brace his feet against the front end of the wagon box and hold his team with tight rein and give strict attention to his driving; and that, in this situation, he was unable to turn his head southward more than to see a train three or four hundred feet from the crossing, at the place where he last looked; and that he saw no train. It appears that the train was somewhat late, and that it was seldom late. Appellee says that he thought the train had passed by; that he thought he heard the whistle of the passenger train for the crossing at his home; and that, if it had been the train whistling at such crossing, the train would have passed the crossing where he was struck. The blind mare, appellee claimed, was very sensitive to the noise and whistle of a train, and he was watching her and depending somewhat on her indicating the approach of a train. He says that she gave no indication of the approach of the train; that the train coasted noiselessly from about the cut down to the crossing; that the train was moving from 45 to 50 miles an hour; that he knew the statutory requirement of sounding the whistle and ringing the bell, and was relying on such warnings. Appellee's testimony must be taken as true, in this instance, and from it appear some diverting and distracting circumstances which tended to occupy his attention, and which must be considered in determining the question of his negligence. *Mackerall v. Omaha & St. L. R. Co.,* 111 Iowa 547.

Courts have many times held that one about to cross a rail-

road track is not bound, as a matter of law, to look and listen for a train at any given point, and that whether the traveler looked and listened at a point where he might have seen a train and avoided the injury, in the exercise of ordinary care, is generally a question for the jury. *Davitt v. Chicago G. W. R. Co.,* 164 Iowa 216; *Case v. Chicago G. W. R. Co.,* 147 Iowa 747.

While no two cases are exactly alike in their facts, the *Davitt* case is quite similar to the case before us. See, also, *Barrett v. Chicago, M. & St. P. R. Co.,* 190 Iowa 509. It appears from appellee's testimony that he could have stopped his team, at the rate he was driving, almost instantly. While it might fairly be concluded from the evidence that, had appellee, when nearing the crossing, been constantly looking for a train, he would have discovered the train which struck him and avoided the accident, still, as said in the *Davitt* case, supra:

"This is not the sole test. He had the right to expect a compliance with the custom of giving signals at that crossing, and if he listened and heard nothing, there was presented a question for the jury to determine whether he was, at the time, exercising due care."

In the *Davitt* case, we said further:

"The rule above stated is not intended as a means of excusing one from the exercise of ordinary care, a duty which is at all times imposed by law upon one approaching a railway crossing which is dangerous; but it is an element of fact or circumstance entering into the ultimate question whether such duty was observed. Cases arise where such reliance may not be placed upon the railroad company to meet that duty, and some such have been cited by appellant; others, and among them those which we have cited, where, when the failure to give the signals creates a feeling of security in the traveler approaching the crossing, such should be permitted to be considered with the other facts and circumstances, in reaching a conclusion of fact upon the question of contributory negligence."

According to his testimony, appellee's mind was on the train; he looked and listened at the east end of the hedge fence and twice afterwards; he was driving a team, one of which was blind, and was crowding the other horse; he was driving on a grade with a depression at the side, and the team required a

large part of his attention; he drove slowly, and could have stopped at any time within a few feet, had he been given warning of the approach of the train; he knew of the required signals, and relied upon them; no warning was given; the train was late, and he thought it had gone by. Under all the facts and circumstances shown in evidence, we think the case was one for the jury, and that the court did not err in submitting the case to the jury.

VII. It is urged that the verdict is excessive. The verdict was for $10,000. Appellee's injuries were very severe. One of the doctors testified that only one in a thousand lives through such injuries as appellee received. A part of his skull is entirely gone, and he has other very serious injuries. Appellee may be, and is likely to be, a permanent cripple. His hospital bill was $908. The one horse killed and the injury to the wagon and harness caused a loss of $200. It is not claimed that the jury was influenced by passion or prejudice. We are not prepared to say that the verdict was excessive.

Results in an affirmance.—*Affirmed.*

PRESTON, C. J., EVANS and FAVILLE, JJ., concur.