JOHN L. CARLIN, Appellee, v. CHARLES M. THOMPSON, Trustee, Appellant et al.

No. 46319.

DECEMBER 14, 1943.

REHEARING DENIED FEBRUARY 11, 1944.

Birdsall, Archerd & Nagle, of Clarion, Frank W. Davis and Davis, McLaughlin & Hise, all of Des Moines, for appellant.

Gleysteen, Harper & Sinclair and Louis S. Goldberg, all of Sioux City, and G. R. Hill, of Clarion, for appellee.

SMITH, J.—In view of our disposition of the case, we shall set out and consider, in the light most favorable to plaintiff, only so much of the record as bears on his alleged freedom from contributory negligence.

The situation and surroundings of the crossing where the collision occurred are shown with little conflict in the record. The evidence consists of oral testimony, photographs, and plats. The circumstances of the accident are not complicated. The "Gridley crossing" is some twelve to fourteen miles east of Estherville on paved Highway No. 9, which runs straight east and west. The Chicago & Northwestern Railway Company, of whose property defendant is the trustee, has a branch line which runs northwest and southeast, crossing said highway diagonally at that point. There was no station agent and no depot building at Gridley but there was a regular stop there to take on papers for distribution at points farther south. Passengers, if any, were taken on at the same time. The stopping place was a short distance south of the highway crossing.

The collision occurred about 5:30 p. m. on May 14, 1940. The day was cloudy and rainy. A strong wind blew from the south. Plaintiff says: "It was a light rain or a heavy drizzle driven by a pretty strong wind." Plaintiff, forty-nine years old, driving a Chevrolet coupé, approached the crossing from the east. The windshield wipers were working; his parking lights were on and his hydraulic brakes in good order. The pavement was pretty wet but plaintiff had a set of practically new tires and "wouldn't say the car skidded."

"Q. You think the wet pavement didn't contribute to your inability to stop or control your car? A. Well, no, not altogether.

\* \* \* I would say that it had a tendency to swerve my car at the first application of the brakes."

The side windows of the car had wing vents open approximately two inches on each side.

Plaintiff testifies that he was traveling fifty-five to sixty miles an hour when he came past the highway warning sign about 600 feet east of the crossing. He then slowed down to forty-five or fifty miles an hour until he reached a point about opposite the entrance driveway into the Burdette place on the north side of the road. On direct examination he says:

"I would say a trifle west of the private entrance into the Burdette farm, I looked up and right there in the highway right of way fence approaching the pavement was this railroad car. I had never seen trains coming from the northwest looking through those cottonwood trees on prior trips. I would say that at that time I was in the neighborhood of one hundred feet from the railroad tracks."

The railroad "train" consisted of a single car, with gas-operated engine with generator and motors. We will still refer to it as a "train." It came to the crossing from the northwest. Plaintiff testifies:

"It was moving I would say at a very low rate of speed and looked like it was going to stop, but, of course, you couldn't tell where it would stop. Had he intended to stop he could have stopped on a dime."

According to the engineer's testimony, when the train reached "the northerly line of the highway it was moving at about eighteen to twenty miles per hour. I was slowing down. At the time I reached the pavement I was moving about fifteen miles per hour."

Plaintiff's auto struck the train on its left or east side, well toward the front. The train came to a stop with its rear end south of the pavement about fifty or seventy feet.

There are certain important physical facts, revealed by the photographs and measurements, that are uncontradicted in

the record. The center of the traveled portion of the Burdette driveway, on the north side of the highway, referred to in plaintiff's testimony, is 291 feet from the center of the crossing. It was just west of that point plaintiff, traveling forty-five to fifty miles per hour, first saw the train *as it entered the highway.*

Just east of the entrance to this driveway there was a row of evergreen trees extending on east along the front of the Burdette premises and along the north edge of the highway right of way for a distance of six or eight rods. According to a photograph offered by plaintiff, these trees would obstruct the view to the northwest of anyone coming from the east along the highway. But after such traveler would reach the point opposite the west end of the evergreens at the entrance to the driveway, approximately 300 feet east of the crossing, there was nothing to obstruct the forward view to the northwest up the railway track an indefinite distance, except a bunch of cottonwood trees in the cattle yard west of the driveway.

Many details of the landscape elaborated upon in the testimony are, under the undisputed record, entirely immaterial. The buildings on the Burdette premises (except the barn), and the grove of cottonwood, box-elder, and other trees north of the barn and house are all due north of the row of evergreens. The barn is at the north end of the driveway and about 150 feet north of the highway. It is obvious none of these things interfered with plaintiff's view as he passed the evergreens; and when he emerged from behind the evergreens, *still 300 feet from the crossing,* all these "obstructions" were far to his right and most of them somewhat back of him.

Neither the photographs nor the oral testimony show the cottonwood grove in the cattle yard west of the driveway as a serious obstruction to the view. Plaintiff's own witness, Burdette, describes the trees as extending down to the railroad right of way "hit and miss." He says:

"* * * they are apt to be close together and they are apt to be quite a ways apart. The trees have large tops and limbs are a long ways above the ground. I would say the limbs are twenty feet above the ground."

One photograph, Exhibit 6, taken under the direction of plaintiff's own counsel from a point in the highway *ten feet east* of the Burdette driveway and looking west and northwest, was offered by plaintiff and will be shown as a part of this opinion. It shows quite clearly that the cottonwood trees could not, under plaintiff's own testimony, have interfered with his view of the train when he reached that point at the west end of the row of evergreens. All views of the premises were taken from an elevation substantially at the level of the sight of one driving a car. Those taken and offered on behalf of defendant corroborate Exhibit 6:

Plaintiff was a salesman. He was familiar with the crossing. It was on his route and he had driven over it twice a day, two days a week, for practically six months. On this occasion he had with him a young woman passenger whom he had undertaken to carry from Forest City to her home in Estherville. She testified for plaintiff:

"Mr. Carlin made various stops seeing his customers. Mr. Carlin was driving his car, a '37 Chevrolet Coupé. I was sitting on his right side. I had been working quite hard for a week and I was just rather relaxed and waiting to get home, looking forward to it. We had been riding along. It was rainy and sort of foggy. It wasn't a very cheerful afternoon. We hadn't been doing much talking. We were just sitting and looking ahead and Mr. Carlin said 'Oh, my God, we are going to hit that train,' and that was the first thing I knew about it. I did not see a headlight on the train, did not hear any whistle or bell, didn't hear a thing. I saw the train right at the moment we were struck, not before.''

I. The evidence and controversy over the cottonwood grove as an obstruction to the view of one coming along the highway from the east is academic in light of the uncontradicted evidence of the respective locations and rates of speed of the two vehicles.

Plaintiff testifies quite definitely as to his speed after he passed the warning sign 600 feet from the crossing. He also corroborates to some extent the testimony of the engineer of the train as to its speed as it approached the crossing. We realize that testimony as to speed always has a degree of vagueness that must be taken into account. But here we have counsel on both sides basing their arguments on the theory that the evidence showed plaintiff's car moving about three times as fast as the train was moving as they both approached the crossing.

Plaintiff says he saw the train when he reached a point "a trifle west of the private entrance into the Burdette farm." He estimates the point as being "in the neighborhood of 100 feet" from the railroad tracks. He was up to that time still driving forty-five to fifty miles per hour. He says the train was then "in the highway right of way fence," in other words, just entering the highway at a point which, by actual measurement, was later shown to be 34 feet from the center line of the paved portion of the highway. As a matter of actual measurement also, the center line of the Burdette farm entrance is 291 feet east of the center of the crossing; so if plaintiff first saw the train at a point 100 feet east of the crossing he was already almost 190 feet past the Burdette entrance. If, on the other hand, we dis-

card his 100-foot estimate and take his language, "a trifle west" of the entrance, he was probably much farther, nearly 300 feet, from the crossing.

This driveway entrance is important in the record for another reason. Various photographs of the crossing are in evidence, taken from points in the highway east of the crossing. All were taken by the same photographer but some were under the direction of plaintiff's counsel and some under defendant's direction. Those for plaintiff were taken about a week after the accident and those for defendant the second day after. There could not have been any material change in the situation in the interim.

Exhibit 6 has already been referred to as one of plaintiff's exhibits. It was taken from a point about 10 feet east of the Burdette entrance, that is, more than 300 feet east of the center of the crossing. Under the undisputed record, when plaintiff passed that point the train was approximately 100 feet from the place of collision.

This Burdette entrance is important because just there plaintiff came out from behind the row of evergreens along the front line of the Burdette yard. Up to that point, as he came from the east, his view to the northwest had been cut off by those trees. It was the point where the ordinarily prudent man would be expected to look for danger as he approached a known railroad crossing. Back of it he knew his view was obstructed and that to look would be a futility.

Examination of this Exhibit 6 makes it quite conclusive that for the last 300 feet covered by plaintiff before the collision, he must have had a practically unobstructed view of the train. It could not have been much more than 100 feet from the inevitable meeting place of the two vehicles when he reached the west end of the evergreens. By his own testimony, before reaching this 300-foot point, he was traveling "blind" (so far as his view to the northwest was concerned) and at a speed of forty-five to fifty miles per hour. He was no stranger to the crossing. He had approached it from the east fifty times in the preceding six months and as many times from the west. There is no evidence of any attention-diverting circumstance. The windows of

his car were closed except that the wing vents were open on each side about two inches. There was a light rain falling, his two windshield wipers were working, and visibility may not have been too good. Under the circumstances, it cannot be thought that, as a reasonably prudent person, he was relying on his sense of hearing and was misled by the alleged failure of sound warning signals.

On no subject is the law itself better settled than on the subject of contributory negligence; but no issue can present a greater variety of facts to which the law must be applied. Other cases are of little value except as they develop the general principles which must be adjusted to meet the infinite variations of fact as they are presented.

We commend the industry of counsel on both sides in the citation of cases thought to be controlling, or at least helpful. The case has been argued with exceptional ability and clarity by counsel for both parties, and the trial court displayed commendable fairness and judicial poise in its rulings on evidence.

We are not impressed, however, with any classification of rules that suggests a *conflict* between the so-called "physical facts" and "prudent person" rules in contributory-negligence cases. We conceive that the test at all times and under all circumstances is the conduct of a reasonably prudent person in like situation. Application of that test always required that the physical facts be taken into consideration. It is true that these facts may at times be found controlling as against conflicting oral testimony. But our search must always be for, and our decision based upon, what would have been the conduct of a reasonably prudent person.

The instant case is perhaps peculiar in that plaintiff was concededly traveling approximately three times as fast as was the train as both approached the crossing. The train, at any given time closely preceding the collision, was correspondingly nearer to the crossing. The result is to make unimportant the evidence of obstructions to the view of the railroad for long distances to the northwest, evidence that would be immensely significant if the respective rates of speed of the two vehicles were reversed. The result further is to make more important

the cases in which the train reached the place of collision first and was run into by the automobile.

It is not necessary to decide whether the statutory "assured clear distance" rule applies here. Code, 1939, section 5023.01. It is sufficient to say that the plaintiff, coming from behind known and clearly visible obstructions nearly 300 feet from the crossing, should be held to the rule that an ordinarily prudent person would have his car under such control that if he then discovered danger of collision he would be able to stop in time to avert that danger.

The language of the concurring opinion in Dombrenos v. Chicago, R. I. & P. R. Co., 194 Iowa 1161, 1179, 191 N. W. 158, 165, is quoted by plaintiff:

"He was not bound to drive at such a rate of speed, when approaching the crossing, or to have his car under such control, as to preclude the possibility of a collision. He could not exercise infallible judgment."

We have no criticism of this pronouncement as applied to the facts of that case. The distance involved there was negligible and plaintiff was moving eight or ten miles per hour. The train approached at a speed estimated at twenty miles per hour in face of an ordinance limiting to six miles. The difference between that and the instant case is too clear for discussion.

In Darden v. Chicago & N. W. R. Co., 213 Iowa 583, 586, 239 N. W. 531, 533, we said:

"The duty is placed on the driver of an automobile to look and listen for trains, and it was one of plaintiff's duties to look, at the place where, by looking, she could have seen, and by listening, she could have heard the same." (Cases are cited abundantly supporting the text.)

Manifestly, the rule stated implies that the purpose of looking and listening is to enable the driver of the car to *stop* if he discovers danger of a collision. He does not meet the test if he looks and listens while traveling at a speed that makes looking and listening a futility.

In Hitchcock v. Iowa Southern Util. Co., 233 Iowa 301, 311, 6 N. W. 2d 29, 35, we had before us a factual record surprisingly

similar to the record here. In that case, as here, the automobile was traveling approximately three times as fast as the train; the driver had, as had plaintiff here, the benefit of the 600-foot warning signal but failed to reduce his speed to a rate that would enable him to stop after reaching the point where he could discover the approaching train. We said:

"He drove into the danger zone, a position of peril, at a speed that made it impossible for him to avoid the collision."

Space does not permit or the occasion justify a discussion or analysis of all the cases cited by plaintiff, though we have examined them all. Suffice it to say we find none of them in conflict with our conclusion here.

Nor does it seem necessary to enter into an extended discussion of the cases cited by defendant. In Hitchcock v. Iowa Southern Utilities Co., just cited, the trial court directed a verdict on the ground that the evidence of plaintiff's freedom from contributory negligence was not sufficient to go to the jury. We affirmed that decision. In our judgment it is controlling here. In addition to the cases therein cited, see Nurnburg v. Joyce, 232 Iowa 1244, 7 N. W. 2d 786; Glessner v. Waterloo, C. F. & N. Ry. Co., 216 Iowa 850, 249 N. W. 138; Beemer v. Chicago, R. I. & P. Ry. Co., 181 Iowa 642, 162 N. W. 43.

We have accepted without question plaintiff's testimony as to speed and as to his efforts to stop his car after discovering that the train was practically in his path. He has, however, offered in evidence a photograph of the resulting wreck of his car. It indicates that he must still have been going at a high rate of speed when he struck the side of the train. It casts doubt upon his testimony either as to the speed at which he was going when he discovered his danger or the distance he then was from the crossing.

There seems no escape from the conclusion that the evidence, considered most favorably in plaintiff's favor, fails to support the verdict.

II. Our conclusion announced under Division I makes unnecessary any discussion bearing on the alleged negligence of defendant.

The decision of the district court must be and it is reversed

and the case is remanded with direction to enter judgment for defendant.—Reversed and remanded.

MULRONEY, C. J., and HALE, MILLER, WENNERSTRUM, and MANTZ, JJ., concur.

BLISS, GARFIELD, and OLIVER, JJ., dissent.

BLISS, J. (dissenting)—I dissent from the opinion of the majority because it fails to follow, or to rightly apply, well-settled principles of law and decisions of this court heretofore consistently followed in this class of cases.

The case, as it was submitted by the trial court and as it comes to us, presents the two issues ever present in this class of cases: the alleged negligence of the defendant, and the alleged freedom from negligence of the plaintiff. The negligence simmers down to the charge that the defendant failed to maintain and exercise, at and as it approached the crossing, that degree of care and the precautions required of it under the law and the surrounding circumstances. While the majority opinion expressly recognizes the rule that the testimony, and all pertinent inferences reasonably deducible therefrom, must be accepted in the light most favorable to the plaintiff, I think that the rule has not been followed as fully and strictly as it should have been in deciding this case. Some additional facts will be helpful to a better understanding of the majority opinion and of my own conclusions.

Various photographs, a blueprint drawn to scale, and a rough outline of the Burdette farm, with some of the buildings, trees, and other physical objects thereon, drawn under the direction of Mr. Burdette, the landlord, together with the testimony, show the following facts: This farm lies within an obtuse angle formed by Highway No. 9, which runs east and west, and the defendant's track, which runs northwest and southeast. The south fence line of the farm parallels the north line of the paved road at a distance therefrom of 34 feet. Measuring east 611 feet along the highway from the intersecting point of the center lines of the track and the pavement is the advance railroad warning sign. A little more than 100 feet west of this sign, and extending west along the farm fence line for about 200 feet, is a row of evergreen trees, which ends at the east side of the Bur-

dette driveway, which is about 300 feet east of the place of collision. This driveway extends north at a right angle for about 150 feet to the barn. Along the east side of the driveway is a row of cottonwood trees. The barn, which is at the north end of the driveway, is 36 feet wide, and 60 feet long east and west. The house is east of the barn about 115 feet and a short distance south. North of the barn and dwelling a few rods are a corncrib, hog house, and chicken houses. Still farther north of and protecting the farm buildings and yards is a mixed grove of cottonwood, box-elder, and other trees. This grove is quite heavy and is four or five rods wide and considerably longer. Abutting the driveway on the west is the cow lot, the south line of which is the south line of the farm along the pavement. This dimension of the lot is 240 feet, and the southwest corner post is 50 feet from the center line of the track and right of way. The east line of the lot along the driveway is 150 feet and extends to the southeast corner of the barn, and the north line of this lot extends west from said corner of the barn for 300 feet to the right-of-way fence. In this cow lot and scattered over it "hit or miss" is a grove of large cottonwood trees, twenty or more in number. They extend from just west of the barn pretty well over the width of the lot to the right-of-way fence. The nearest of a group of four trees is about a rod from the southwest corner post, which is slightly less than 50 feet from the east rail of the track. In the cow lot, among the trees, is a straw cow shed—a framework with straw piled over and around it. It is 20 feet wide, and 25 feet long east and west, and 16 or 20 feet high. Its south side is 90 feet from the south line fence and its east end is about 75 feet from the east line of the lot. The lot is enclosed on straight lines and is 150 feet wide north and south.

As one proceeds west on the pavement from the railroad sign 611 feet east of the track his view to the right of the track north of the crossing is quite completely blocked by the evergreens, the row of cottonwoods, the farm buildings, and the large grove to the north until he reaches the Burdette driveway, or the east end of the evergreens, which is 300 feet from the center of the track at the crossing. From there on west on the pavement to quite close to the southwest corner post of the cow

lot the traveler seeking to see such a train as the defendant was operating approaching on his right from the northwest must look through the cow lot, with his view interfered with by the barn, the cow shed, and the cottonwood grove. E. L. Burdette, the landlord, as a witness for plaintiff, testified:

"I drove over the tracks thousands of times, and as far as clear vision is concerned, that would be a little different story. For the actual clear vision of it this bunch of cottonwoods comes within a rod of my corner post in this cattle yard. If you wanted to look through these cottonwoods, well as soon as you pass the barn you can get a vision through there of the railroad track, if you want to look through the cottonwoods and where the straw stack and all that is, *or if you want a clear view without any obstructions you have to get within a rod of this corner post of my cattle yard, that is, the extreme west corner post at the railroad.*" (Italics supplied.)

Speaking of the difference of standing still and looking for a train through this cow lot, and looking from a passing automobile, this appears in his testimony, on cross-examination:

"Q. Well if you were driving along in your automobile and looking out for a train, you would be purposely looking, wouldn't you, and could see? A. Yes, but that would be different than standing out in the yard and looking."

Going northwest along the track from the center of the crossing for 522 feet is a bridge about 20 feet long, and 925 feet from the said starting point is the crossing whistling post, and 1,302 feet from the crossing is the station whistling post. The so-called "train" of the defendant is a single vehicle 74 feet long and close to 13 feet high. Its color is described as an "olive drab," with five alternated white and red stripes, below the windows, in front. The track is on a fill as it approaches the crossing from the northwest. Burdette said of this grade:

"It approaches the crossing on a grade and for several hundred feet out that grade is five or six feet high, and further north it is higher yet."

At the time of the collision the trees were in full leaf and the vegetation was green. The defendant's "train" approached the crossing along one side of an obtuse angle and did not present a full broadside view to a motorist approaching the crossing from the west.

The plaintiff testified that when he reached the railroad sign, 611 feet east of the crossing, he gradually reduced his speed from fifty-five or sixty miles an hour to forty-five or fifty miles. He testified:

"I wouldn't say which direction I looked first. *I looked to one side and then to the other* AND LISTENED AND I SAW NOTHING OR HEARD NOTHING, and as I approached the crossing my speed I imagine was reduced down to, oh, around between forty-five and fifty miles an hour, and at a distance east of the crossing, I would say a trifle west of the private entrance into the Burdette farm, I looked up and right there in the highway right of way fence approaching the pavement was this railroad car. I would say that at that time I was in the neighborhood of one hundred feet from the railroad tracks. I LOOKED BOTH WAYS AND LISTENED *and heard nothing, saw nothing. There was no whistle signal.* \* \* \* *There was no bell rung. I didn't hear a bell. I didn't hear a whistle or bell before or after leaving the crossing sign.* \* \* \* I would judge that sign was about 600 feet east of the crossing." (Emphasis supplied.)

On cross-examination, plaintiff testified:

"I looked to the right, the northwest, through that grove of cottonwood trees to see whether a train was coming. After that I looked ahead toward the crossing. \* \* \* it was after reaching that highway railroad crossing sign that I looked in either direction, I wouldn't say that I looked to the northwest first and then to the south. I might have looked to the south first and then to the north. I wouldn't say which way I looked *first* but I looked. I couldn't see anything through that row of evergreen trees. After passing the private entrance to the Burdette farm there is a point you can see a train through the cottonwood trees if you happen to look at the proper time. \* \* \* I could see considerable distances, notwithstanding the rain. I believe there were places where you could see a train through the cottonwood

trees if you look at that angle where you could get this glimpse of the track. * * * if it was a gas car you would have to catch it just within that certain viewpoint to see that car. * * *

"Q. Now *if you happened to see between the trees and the gas car was in that angle, the visibility was such that you could have seen it that day?* A. *Right at that point I would say you probably could.* * * * The Court: Now as I understand you, you said there was one place where you could look through the trees and see a train if there was one, but Mr. McLaughlin spoke of *places* where you could see it. *Now I want the record straight about that one way or the other.* A. Well, Your Honor, there is a place coming on to this crossing glancing northwest against the railroad track there through those cottonwood trees, that there is a spot in the railroad that you can see if you happen to catch it right in that— The Court: Well that is one place or several places? A. No, just one. The Court: All right. Q. [by Mr. McLaughlin] Don't you think, Mr. Carlin, that there were a number of places where if the gas car had been at the right angle with reference to those places where it could be seen by a traveler along the highway there? A. *Well I would think that would depend a lot on one's position, as you are moving along the highway in a car I would say that you would have to be quite alert to catch that spot that you could see up that track.* Q. There were places though where you would look through *between those trees and if the car was opposite those places you could see it?* A. *That's right."* (Italics supplied.)

This testimony, assuming it to be true, quite clearly indicates that the obstructions in the cow lot interfered with the view of a motorist approaching from the west much more seriously than the majority opinion indicates. Of course, if the motorist happened to be at one end of an opening through the trees at the same time the railroad car was at the other end of the opening, the motorist could see the car. But each vehicle would have to be in the proper position to make this possible. Both vehicles were moving. The railroad car moved at a speed of thirty-five miles an hour past the crossing whistling post, to eighteen or twenty miles, and finally fifteen miles an hour, as it reached the pavement. The automobile was going 45 to 50 miles an hour. A single tree trunk along the roadside can hide a

much larger object in the field beyond than its own width. This may be so readily demonstrated by walking along any street with trees along the curbing. Cars coming toward you on the street two or three blocks, or even a block away, may be blotted out of your vision. A tree along the highway will shut out the view of a large barn, a quarter of a mile away, from the motorist. This is not one of those physical-fact cases such as Nurnburg v. Joyce, 232 Iowa 1244, 7 N. W. 2d 786, where, if a traveler had looked at any point within the range of his vision and the line of his eyes, he would have seen the approaching car or train which hit him. Under the record in this case, this court cannot, in fairness to this plaintiff, terribly crippled for life, say, as a matter of law, that Carlin did see, or should, without question, have seen the defendant's gas-and-electric car before he did. It is significant that when the defendant, with the aid of its civil engineer and the photographer, took pictures of the railroad car at distances of approximately 100, 700, and 1,300 feet north of the crossing, the photographer placed his camera on the pavement and the engineer walked down the track at the three points where he could see the photographer and marked those places on the rail, and then had the railroad car *come to a stop* at the respective marks and the camera was snapped. There is not any evidence, nor is such evidence possible, to show that the pictures so taken, or any similar views, were ever at any time impressed on the retina of Carlin's eyes as he came down the road on May 14th. There is no question but that the pictures were so taken. This is what the engineer who was on the car when it struck Carlin testified:

"May 16th was my next trip after this accident. My first stop in taking the pictures * * * was at the whistling post furthest north. That stop was on our way to Gridley. *There was someone there at the time to stop me.* * * * We were notified by the dispatcher that pictures were to be taken at the crossing on our return trip on that day. * * * We were given notice that there would be a man there to take our pictures and that they would stop us at the point they wanted the pictures taken. We were told *exactly* where to stop when Exhibit No. 3 was taken. *I didn't pick the spot. I presume they marked the*

*place on the rail. I did not get out in placing the car and took
no observations myself.* That was also true when Exhibit No. 4
was taken. *I was told where to stop. I did not attempt to locate
the car myself for that photograph and made no observations as
for distance or visibility. Same is true as to Exhibit No. 5."*
(Italics supplied.)

Carlin, as he drove homeward on this drizzly afternoon, did
not have the benefit of a civil engineer to pick the spots of visi-
bility for him. He looked and listened, but he testified he neither
saw defendant's car nor heard either of the statutory signals.

The majority opinion states:

"It is sufficient to say that the plaintiff, coming from be-
hind known and clearly visible obstructions nearly 300 feet
from the crossing, should be held to the rule that an ordinarily
prudent person *would have his car under such control that if he
then discovered danger of collision he would be able to stop in
time to avert that danger."* (Italics supplied.)

No authorities are cited supporting any such rule.

A statement of law to the contrary, from Dombrenos v.
Chicago, R. I. & P. R. Co., 194 Iowa 1161, 1179, 191 N. W. 158,
165 (concurring opinion of Justice Stevens), is quoted in the
majority opinion, with the statement that it is not applicable
to this case. The quoted statement from the Dombrenos case is
a general principle, and I cannot go along with the assertion that
it is not applicable in this case. This is not an assured-clear-
distance-ahead case. Can it be the law that a motorist must so
drive his automobile over the highways as to avoid the possibility
of injury to himself? Such care would not be the ordinary or
reasonable. care of a prudent man under the circumstances.
It would be supercare, extraordinary care. Such care is not
required. The duty of the motorist as he approaches a highway
intersection or a railway crossing is not an absolute one, but is
limited by the obligation to exercise reasonable care for his own
safety under the existing circumstances. He is not bound to so
operate his car as to avoid the possibility of danger, or to "be
able to stop in time to avert that danger." The law burdens
him with no such duty but requires "rather that he shall observe

all the cautions required by reasonable and ordinary regard for his own safety * * *." Gray v. Chicago, R. I. & P. Ry. Co., 160 Iowa 1, 9, 139 N. W. 934, 937. This court has repeatedly denounced the rule of care contended for in the majority opinion. In Gregory v. Suhr, 221 Iowa 1283, 1285–1292, 268 N. W. 14, 15, this court held to be error an instruction which stated that the driver of a motor vehicle *"shall keep the same under proper control at all times,"* and shall *"have his car under control so as to avoid collision* with others." Of it the court said:

"* * * the jury would be warranted in inferring that it imposes an absolute duty upon defendant to have his car under such control as to avoid the collision, regardless of his use of ordinary care. * * * Appellant's contention that a driver must have his car under such control as to be able to avoid a collision under any and all circumstances, would, in effect, require it to be driven in such a manner so as to be able to stop it instanter. * * * It can hardly be claimed that this instruction does not impose an absolute duty upon the defendant to have his car under such control as to avoid injury to others at all times, and under any and all circumstances. Such is the meaning conveyed thereby."

In Knutson v. Lurie, 217 Iowa 192, 203–205, 251 N. W. 147, 153, the court instructed the jury that it is the motorist's "duty to reduce the speed of his car so in case such vehicle enters into his path, and there is danger of collision, he can bring his vehicle to a stop and avoid injury." In reversing, this court said:

"The instruction * * * required Mrs. Lurie, first, to reduce the speed of her car whether by reasonable or ordinary care she could do so or not; and, second, the instruction required Mrs. Lurie to stop her car and avoid the injury even though she could not do so by the exercise of reasonable or ordinary care. It was the duty of Mrs. Lurie at all times to use reasonable or ordinary care. What is reasonable or ordinary care always must be determined by the facts and circumstances of the case. Obviously the instruction * * * was prejudicial."

In Looney v. Parker, 210 Iowa 85, 89, 90, 230 N. W. 570, 572, the trial court instructed that a motorist following another car

should "maintain such control of his car as to enable him to stop without hitting the car ahead of him." Condemning the instruction, the court said it "'imposed upon the driver the duty of exercising such control as would avoid collision, whether he was negligent or not. The driver's duty was to exercise reasonable and ordinary care."

In Jarvis v. Stone, 216 Iowa 27, 34, 247 N. W. 393, 396, the court instructed that if the defendant "failed to use such means as were within his power to avoid injury to plaintiff" it would be negligence. Speaking through Justice Claussen, the court said:

"The defendant was not obligated to 'adopt such means as were within his power to check the progress of his vehicle and avoid collision with the plaintiff.' He was required to use ordinary care. It cannot be said as a matter of law that a failure to use all means within the power of the driver to check the car was a failure to exercise ordinary care.".

In Bradley v. Interurban Ry. Co., 191 Iowa 1351, 1353, 183 N. W. 493, 494, the instruction required the passenger, as a matter of law, to alarm the driver and cause him, if possible, to stop until the danger was passed. Speaking for the court, Justice Weaver, with his incomparable felicity for phrasing, said:

"With the first proposition, that the invited guest * * * is not absolved from his obligation to use reasonable care for his own safety, there is no room for dispute; but this is as far as the court can keep step with counsel. The leap from the statement of duty of reasonable care for one's own safety to the conclusion, as a matter of law, that the invited guest is negligent if he fails to see an impending danger in time to interfere and prevent it, is entirely too far. The question as to what is reasonable care in such an emergency is peculiarly a question for the jury."

In Teufel v. Kaufmann, 233 Iowa 443, 6 N. W. 2d 850, 852, 853, Chief Justice Wennerstrum quoted the Bradley case, supra, and cited Codner v. Stowe, 201 Iowa 800, 803–810, 208 N. W. 330, in support of the court's holding that the duty required was

the exercise of ordinary care under the circumstances and not the absolute duty to do some specific thing.

Using the incorrect measure of the duty and care required of Carlin by law, the majority necessarily came to a wrong conclusion in holding him guilty of contributory negligence as a matter of law. The traveler approaching a railroad crossing is not bound to look or listen at any particular place, nor at all points, nor any number of times. The law does not fix any such times or places. The true guide in the determination of whether Carlin exercised due care is, Did he use the care which a reasonably prudent man would have exercised under like circumstances? Was he reasonably justified in concluding, after looking along the more than a quarter mile of track through the cottonwoods and other obstructions in the cow lot and seeing no railroad car, and after he had listened and heard no whistle or bell, that he might safely proceed as he did to the crossing? Certainly this court ought not say, as a matter of law, that he was contributorily negligent. Haven v. Chicago, M. & St. P. R. Co., 188 Iowa 1266–1268, 175 N. W. 587; Brossard v. Chicago, M. & St. P. Ry. Co., 167 Iowa 703, 719, 149 N. W. 915; Winey v. Chicago, M. & St. P. Ry. Co., 92 Iowa 622, 625, 61 N. W. 218; Platter v. Minneapolis & St. L. R. Co., 162 Iowa 142, 143 N. W. 992; Markle v. Chicago, R. I. & P. Ry. Co., 219 Iowa 301, 305, 257 N. W. 771.

The guide was well stated by Justice Weaver, in Corbett v. Hines, 194 Iowa 1344, 1348, 191 N. W. 179, 181, thus:

"The conclusion is not to be found by fixing our minds on any one fact or circumstance and saying that, because thereof, reasonable and fair-minded men cannot disagree upon the proper verdict. It is to be reached, rather, by a comparison and weighing of all the testimony, by linking circumstance with circumstance, by deductions and inferences fairly to be drawn from the entire case, viewed in the light of the common knowledge and common experience of mankind; and this, under all ordinary conditions, is the exclusive province of the jury."

The majority opinion apparently concedes that the issue of defendant's negligence was for the jury. It disposes of this question in sixteen words as "unnecessary discussion." In cases

of this character the questions of contributory negligence and the defendant's negligence are ordinarily closely related. So often the first is dependent upon the latter. This is especially true where, as in this case, the negligence relied upon is the failure of the defendant to give the statutory warning signals. I therefore think it to be highly important and proper to discuss that issue.

Section 8018, 1939 Code, requires a "steam whistle" (this "train" had a horn) to be twice sharply sounded at least 60 rods before a crossing is reached, and after sounding the whistle the bell shall be rung continuously until the crossing is passed. Failure to do so shall make the railway company liable for all damages suffered by reason of such neglect. The three employees on the train testify that this was done. There was one passenger only on this train. His name was taken and he was interviewed by the defendant but he was not a witness. A fourteen-year-old girl who put the Mason City Globe-Gazettes on this train each weekday also so testified. Her sister testified to hearing the whistle somewhere along the line. So also did the tenant's wife, who was in the house on the Burdette farm. Likewise did a visitor in the Foster home across the road from the Burdette farm. A jury might well question her testimony. Foster also testified to the station and the crossing whistles. Not one of these last four witnesses testified that he heard the bell ring. Mr. Weller and his son were at the elevator near the crossing. They testified that they heard the whistle when it sounded at the crossing a mile north of the Gridley crossing but had no certainty whether it was sounded at the latter crossing where the collision occurred. Neither of them was asked by the defendant about the ringing of the bell. Six of defendant's witnesses and plaintiff and Mrs. Langmo, all in positions where they could have heard the bell ring, if it rang, did not hear it ring.

The defendant's argument speaks of the testimony of Carlin—that though he was at a place where he could have heard, he looked and he listened but heard neither the whistle nor bell at any time—as negative testimony. I will refer to the testimony of Mrs. Langmo, the passenger, later. I have set out all of Car-

lin's testimony respecting the failure to give these statutory signals. I submit that it is not negative testimony. There is no decision of this court which holds that testimony of the character of that of Carlin, given by a person in a position to hear such signals if given, who was looking for a train, who reduced the speed of his automobile to better see it and to better hear any signals, whose mind was alert to the situation and was not diverted, and who was listening for the signals, is negative testimony. Defendant cites no decision which so holds, and no decision which lays down any rule, standard, or measure under or by which Carlin's testimony could be said to be negative and created no conflict on this issue. It was affirmative testimony. Such has been the uniform holding of this court since litigation of this kind began. Of such testimony, the late Professor Wigmore, the greatest authority of all time on the subject of Evidence, in Volume II, 3d Ed., section 664, of his work, said:

"§664. Negative Knowledge; Testimony that a Fact would have been Seen or Heard had it occurred. In applying the foregoing principle requiring that the witness' inferences be based on adequate data (ante, §659), Courts have often been asked to exclude testimony based on what may be called *negative knowledge,* i. e. testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred. Yet there is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. It may even sometimes be stronger than affirmative impressions. The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred. This sort of testimony is constantly received,—particularly in proof of the failure to give railroad signals, the loss of a chattel, the absence of a witness, the non-existence of a fictitious person, the non-payment of money, and other negative facts."

This statement of the rule by Wigmore was quoted by this court in Hoffard v. Illinois Central Ry. Co., 138 Iowa 543, 550, 110 N. W. 446, 449, 16 L. R. A., N. S., 797, and the quotation from the latter case was cited with approval in Mann v. Des

Moines Ry. Co., 232 Iowa 1019, 7 N. W. 2d 45, 57, the latest decision of this court on the subject.

In full support of the appellee's contention that this affirmative testimony of Carlin's made the issue of whether the defendant was negligent in not giving the signals a matter for the jury to determine, see the following decisions: Reed v. Chicago, St. P. M. & O. Ry. Co., 74 Iowa 188, 190, 37 N. W. 149; Lee v. Chicago, R. I. & P. Ry. Co., 80 Iowa 172, 174, 45 N. W. 739; McMarshall v. Chicago, R. I. & P. Ry. Co., 80 Iowa 757, 762, 45 N. W. 1065, 20 Am. St. Rep. 445; Annaker v. Chicago, R. I. & P. Ry. Co., 81 Iowa 267, 271, 47 N. W. 68; Sclensky v. Chicago G. W. Ry. Co., 120 Iowa 113, 115, 116, 94 N. W. 272; Wiar v. Wabash R. Co., 162 Iowa 702, 711, 712, 144 N. W. 703; Morgan v. Iowa Cent. Ry. Co., 151 Iowa 211, 213, 130 N. W. 1058; Stanley v. Cedar Rapids & M. C. Ry. Co., 119 Iowa 526, 533, 93 N. W. 489; Hines v. Chicago, M. & St. P. Ry. Co., 196 Iowa 109. 112, 113, 194 N. W. 188; Brossard v. Chicago, M. & St. P. Ry. Co., 167 Iowa 703, 713–716, 149 N. W. 915; Finley v. Lowden, 224 Iowa 999, 1002, 277 N. W. 487; Mackerall v. Omaha & St. L. R. Co., 111 Iowa 547, 549, 82 N. W. 975; Brose v. Chicago G. W. R. Co., 185 Iowa 867, 871, 171 N. W. 149; Hough v. Illinois Cent. R. Co., 169 Iowa 224, 233, 149 N. W. 885; Anderson v. United States R. Admn., 203 Iowa 715, 718, 211 N. W. 872; Chilcote v. Chicago & N. W. R. Co., 206 Iowa 1093, 1096, 1100, 221 N. W. 771; Hitchcock v. Iowa Southern Util. Co., 233 Iowa 301, 6 N. W. 2d 29, 32, 33; Bush v. Chicago, R. I. & P. Ry. Co., 216 Iowa 788, 247 N. W. 645; Roberts v. Hennessey, 191 Iowa 86, 102, 181 N. W. 798.

As established by the decisions of this court, above cited, the testimony of Carlin was positive testimony, the weight and probative value of which was for the jury. His testimony made the issue as to the signals one for the jury to determine.

Mrs. Langmo, the passenger, testified:

"Mr. Carlin was driving. He made various stops to see his customers. I was sitting on his right side. * * * I was just rather relaxed and waiting to get home, looking forward to it. We had been riding along. It was rainy and sort of foggy. * * * We hadn't been doing much talking. * * * I did not hear any

whistle or bell, didn't hear a thing. I saw the train right at the moment we were struck, not before. * * * I was awake, my eyes were open, I was completely relaxed. I really wasn't thinking about anything. I was at ease. I wasn't nervous as I usually am in a car. * * * I could see out through the windows notwithstanding the rain. Two windshield wipers were operating. I could see through the windshield and could see out through the window on my side. I could see the objects along the road. I could see through the right window as far as I would want to, probably a half mile as plainly as ordinarily. * * * I really wasn't listening for a whistle as we came along there, but I think I would have heard a whistle because I usually hear train whistles. * * * I would say the whistle was not blown for if it was I would have heard it. * * * I didn't think about whether a train would be whistling or not, but I think I would have heard it."

Her testimony is not needed to take the issue to the jury but I am of the opinion that it is affirmative testimony, the weight of which is perhaps lessened because she was not giving the attention to the matter of signals as actively as Carlin. However, she was where she could hear, and was simply sitting at ease. She was like the witness Marcy, in Hines v. Chicago, M. & St. P. Ry. Co., supra, 196 Iowa 109, 113, 194 N. W. 188, 190, concerning whom the court said:

"Plaintiff testified definitely that he listened. * * * Marcy's testimony was less definite, but he was in a position to hear subject to the same limitations as governed the plaintiff."

See, also, Cotton v. Willmar & S. F. R. Co., 99 Minn. 366, 369, 109 N. W. 835, 837, 8 L. R. A., N. S., 643, 116 Am. St. Rep. 422, 9 Ann. Cas. 935, quoted at length in 140 A. L. R. 532. There it was held:

"The degree of attention will affect the value of the evidence, but the fact that the witness was not giving his direct attention at the time for the purpose of learning whether signals were given will not destroy the value of the evidence if he was present at the crossing, was conscious, and in the possession

of his ordinary senses, and testifies positively that he heard no signal."

In Roberts v. Hennessey, supra, 191 Iowa 86, 102, 181 N. W. 798, 805, we said:

"The traffic officer, the appellee, and other witnesses testified either that the horn was not sounded *or that they did not hear it, when they were in position to have heard it if it had been sounded. This clearly made a case for the jury on this question.*" (Italics supplied.)

That testimony of the character of Carlin's cannot be ignored as being a mere scintilla, or outweighed by so-called positive testimony, appears in Wiar v. Wabash R. Co., supra, 162 Iowa 702, 711, 144 N. W. 703, 707, in a similar situation, where the court said:

"The greater number of witnesses seem to be with the defendant; but it is not our province, on appeal, to settle such conflicts. These, under our system, are for a jury. If this were not so, a jury would have no function to perform."

Plaintiff had a right to rely upon the giving of these signals and to govern his conduct accordingly. This fact must be considered in passing upon the question of contributory negligence. Since, under the record, the issue of whether the signals were given was for the jury, almost of necessity the issue of plaintiff's contributory negligence was for the jury. See Corbett v. Hines, supra, 194 Iowa 1344, 1349, 191 N. W. 179; Nederhiser v. Chicago, R. I. & P. Ry. Co., 202 Iowa 285, 290, 291, 208 N. W. 856; Case v. Chicago G. W. Ry. Co., 147 Iowa 747, 751, 126 N. W. 1037; Platter v. Minneapolis & St. L. R. Co., supra, 162 Iowa 142, 143 N. W. 992; Anderson v. United States R. Admn., supra, 203 Iowa 715, 717, 211 N. W. 872.

This court has uniformly held it to be the well-settled law that if there is any evidence tending to establish the defendant's negligence or the plaintiff's freedom from contributory negligence, these issues are for the jury. It is only in cases where the facts are clear and undisputed, and the cause and effect so apparent to every candid mind that but one conclusion may fairly be drawn, that either of these issues is for the court to

determine. It has been the holding of this court and of all courts that if reasonable men may fairly differ as to the conclusions to be drawn from the evidence these questions are for the jury. It would serve no purpose to cite numerous authorities in support of these well-known rules. It is a very exceptional case when the circumstances are such that questions of proximate cause or contributory negligence are for the court. They are peculiarly questions for the jury, particularly as to everyday matters of life, respecting which a jury of laymen, with their composite experiences in all walks of life, is a better-qualified tribunal for their determination than a court.

As said by Justice Weaver, in Nelson v. Hedin, 184 Iowa 657, 659, 169 N. W. 37, 38:

"How much of the testimony on either side was true, its weight and value, and on which side was the apparent preponderance, were all jury questions; and it was not in the province of the trial court to pass thereon, nor is it the subject of review by this court, further than to see if the record contains any evidence to support the verdict. This is an elementary proposition, too often repeated and too thoroughly understood to call for any citation of authorities."

But see, Huffman v. King, 222 Iowa 150, 153, 154, 268 N. W. 144; Pierce v. Dencker, 229 Iowa 479, 484, 294 N. W. 781; Fitter v. Iowa Telephone Co., 143 Iowa 689, 693, 121 N. W. 48, 50; In re Estate of Green, 224 Iowa 1268, 278 N. W. 285.

It was for the jury to pass upon the issue of defendant's negligence. There can be no question about this under the record. The majority opinion concedes it by not passing upon it. Since, then, the jury could have found that the statutory signals were not given, and the plaintiff approached the crossing without benefit of their warning, and had a right to govern his conduct accordingly and in the belief that no train was approaching, it ought not be said, and cannot in fairness and justice be said, that fair-minded and reasonable men, honestly seeking the truth, could come to but the one conclusion, that the plaintiff was contributorily negligent.

In my humble opinion the able trial court was right in submitting all issues to the jury, and that body came to a conclusion contrary to that reached in the majority opinion.

I would affirm the judgment.

GARFIELD and OLIVER, JJ., join in this dissent.