MARY DAVITT, GUARDIAN, Appellee, v. CHICAGO GREAT WESTERN RAILROAD COMPANY, Appellant.

**Railroads:** CROSSING ACCIDENT: APPEAL: FINDINGS OF FACT: CONCLUSIVENESS. Where the only complaint of a railway company, on appeal from a judgment against it for a crossing accident, was that the record affirmatively showed contributory negligence of plaintiff, the finding of defendant's negligence in failing to give the statutory crossing signals as alleged and submitted will be accepted as a proven fact, when considering the issue of contributory negligence.

**Same:** CONTRIBUTORY NEGLIGENCE: EVIDENCE. One about to cross a railway track is not bound as a matter of law to look and listen for an approaching train at any given point; and whether he looked and listened at a point where he might have seen the train, and by the exercise of ordinary care avoided the accident is generally a question of fact. Evidence held to show that the driver of the team in the instant case might have discovered the approaching train before it was too late, had he been constantly on the lookout.

**Same:** SIGNALS: CONTRIBUTORY NEGLIGENCE: EVIDENCE. One approaching a railway crossing may expect the giving of statutory train signals; and if he listened but heard no signal the question of whether he exercised due care at the time was for the jury. His right, however, to expect the giving of signals will not excuse his exercise of ordinary care for his own safety at all times when approaching the crossing. In the instant case the question of whether plaintiff's ward, who was driving the team for him, was guilty of negligence was for the jury.

*Appeal from Warren District Court.*—HON. W. H. FAHEY, Judge.

THURSDAY, FEBRUARY 19, 1914.

ACTION for damages resulting from negligence in operating train. From a verdict and judgment for plaintiff, the defendant appeals.—*Affirmed.* ·

*Carr, Carr & Evans,* and *F. P. Henderson,* for appellant.

*Berry & Watson,* for appellee.

WITHROW, J.—I. Action by Mary Davitt, as guardian of Phillip Davitt, for damages resulting from the striking of a team of horses and buggy by a train of the defendant. There was a trial to a jury, resulting in a verdict and judgment for the plaintiff, from which the defendant appeals. Appellant presents no error as against the finding of negligence on its part, but insists that the record affirmatively shows contributory negligence on the part of the driver of the team; and this is the only question presented by the appeal. The evidence material to that inquiry is in substance as follows: The crossing where the accident occurred was where the right of way intersects a lane leading to plaintiff's house, which is about thirty rods from the line of railway; this private lane, however, being by the appellant company treated as a highway crossing. The lane runs east and west and crosses the railroad at an angle; the crossing being known as "Davitt's crossing." From Davitt's house toward the crossing, for about half the distance the ground slopes away from the house; it is then level for some distance; and, as the crossing is approached, it rises gradually. On the north side of the lane is a row of willow trees that extends to within about fifty-three feet of the right of way fence. Between this point and the railway track there are no trees. From a point just outside the last trees at the north of the lane to the west rail of the track is one hundred and fourteen feet by actual measurement. This point is four feet eight inches below the rail,

and from this point the ground gradually rises to the crossing; fifty-seven feet from the rail being about three feet below the level of the rails and thirty feet in the neighborhood of twenty inches below. The railroad track is on a fill at the crossing, and the fill extends almost to the first cut north. The ground west of the railroad track between it and the right of way fence for a part of the distance to the first cut is lower than the track. To the mouth of the first cut north of Davitt's crossing is about three hundred feet. The length of the first cut north is five hundred feet. The bank of the cut at its highest point in about four feet above the level of the rail. Going north from Davitt's crossing the railroad rises at the rate of one foot in one hundred feet, and the track is straight north of Davitt's crossing for 1,200 feet.

Nels Sandegard, the driver of the team when the accident occurred, testified:

I worked for Davitt during October, November, and December before the accident. I was shucking corn across the railroad from the house; corn was hauled from the field to the crib, and I crossed the track at this crossing a great many times hauling corn. I had driven the plaintiff's little boy to school for about a month before the accident, and left the house about the same time every morning. The accident occurred about 8:30, and I left the house at about the time every day that this train passed over this crossing. On the morning of the accident, I knew the train had not gone by and that it would come along very shortly if it was on time. As I left the yard, I said to myself I didn't think the train had gone down yet; it must be late. I didn't know exactly when it was coming, but I was expecting it. Leaving the house and driving down the lane to the crossing, you go down a little hill, then there is a little level place, and as you approach the crossing the ground gradually rises. After you pass the willow trees there is nothing to obstruct the view looking to the north except a pile of ties and the hill through which the right of way was cut. The pile of ties was inside the right of way fence and between the fence and track, something like forty or fifty feet north of the crossing, about halfway between the track and the right of way fence, and,

if any difference, it was closer to the track than the fence; think the closest side of the ties was fourteen or fifteen feet from the track; length of the pile east and west was the length of a tie, about eight feet north, and south it was not as much as eight feet; it was about shoulder high, about fifty-seven inches. It was a clear, bright, cold winter morning. I wore a cap, but don't remember whether I had it pulled down over my ears. It was a winter cap with ear laps, made of cloth with fur on the inside, laps over the ears padded with fur. Don't remember whether the side curtains were on or not. I started from the house after the little boy had got in and drove up the lane, the horses on a trot. When about one hundred and fifty feet from the crossing, I looked to the north to see if a train was coming. When I got to a point one hundred feet from the crossing I looked both ways; that was the last time I looked until I was struck; I didn't look out again from the buggy either north or south, until I was struck at the crossing. Up to the time I was struck, the horses were on a trot, about six miles an hour. I trotted the horses along till I got to a point about one hundred and fifty feet from the crossing, and there I looked to the north; didn't stop the team. I went right on until I reached a point one hundred feet from the crossing, then I looked north again and looked south. The team kept right on trotting and went right onto the crossing, across the one hundred feet, and the team was struck. When I looked from the one hundred and fifty-foot point, I could see some of the track; I could not see anything north of the cut. The last point I looked, the one hundred-foot point, was about even with the last trees; from that point I could see up the track to the cut; that is all I saw from here. I simply looked to see whether there was any train between the crossing and the mouth of the cut, and all I could see was that there was no train between the crossing and the mouth of the cut. I looked as far north as I could see and could not see any farther north than that. I was sitting in the buggy on the seat, which was three to three and one-half feet from the ground. When I looked the last time, one hundred feet from the track, the ties were not in my way, but right up toward the track they might be some. Unless the train was directly behind these ties and at a point fifty feet from the crossing, the ties would not obstruct the view from the one hundred-foot mark. I have walked through the first

cut to the north of the crossing; I can just about see the top of the bank as I walk through. After passing out of that cut to the north, I don't know of anything to obstruct the view of the railroad track to the second cut. When I looked at the one hundred-foot point, all I could see of the railroad track was the part between the crossing and the cut. The hill where the cut rises, as you go west from the track, rises toward the right of way fence. At one hundred feet west of the railroad track, I think the lane was about six feet below the level of the rails. From the one hundred-foot mark, the lane gradually rises to the track. The railroad at Davitt's crossing is on the downgrade, and the cut is higher than the crossing. North of the cut the track still rises, and it is higher than the crossing. After looking at the one hundred-foot point, I drove on with my face to the east until I was struck.

A witness, Gilliland, called by plaintiff, testified that, on approaching the track from the one hundred and fourteen-foot point, the view to the north became wider, and when thirty-five to forty feet from the track one could see one hundred to one hundred and fifty feet into the cut. At a point fifty feet from the crossing the only obstruction is the hill, four feet two inches high, and the depression in the lane below the track. Other witnesses testified in substance to the same facts. This sufficiently presents the record for a consideration of the question raised by this appeal.

II. The particular negligence charged was that in approaching the crossing where the accident happened the engineer in charge of the train failed to blow the whistle or ring the bell. While this crossing was a private lane, in appellant's brief it is stated that the defendant company treated it as though it were a private crossing, and the evidence is without dispute that it was the practice of those in charge of the trains passing over it to give the customary crossing signals.

As no question is here raised save that of the alleged contributory negligence of the young man who was at the

time driving the team of the appellee, we must then accept as a proven fact in the case that there was a failure on the part of appellant's employees to give the usual and necessary signals in approaching the crossing, such being the grounds of negligence submitted to the jury, for upon such finding of fact must in some degree depend the question of contributory negligence.

1. RAILROADS: crossing accident: appeal: findings of fact: conclusiveness.

It is the claim of the appellant that from the undisputed testimony it appears that, had the driver in approaching the crossing exercised ordinary care in looking and listening, he must have seen and heard the approach of the train in time to have avoided injury. While the rule as to looking and listening upon approaching a railroad track has been often stated and recognized as summing up the degree of care which should control and guide one, in the absence of other conditions excusing from such as a continuous duty, such is not without its qualifications. Many cases have arisen and have been decided by this and by the courts of other states recognizing the exceptions which at times arise, each case depending upon its particular facts.

In *Case v. Chicago, G. W. Ry. Co.*, 147 Iowa, 752, the following language was used by this court: "One about to cross a railway track is not bound, as a matter of law, to look or listen for a train at any given point. Whether or not he looked and listened at a point where he might have seen the train and avoided the injury in the use of ordinary care and prudence is generally a question for the jury."

2. SAME: contributory negligence: evidence.

The evidence tends to show that the driver of the team which was killed did twice look to see if a train was approaching, the first time when about one hundred and fifty feet from the crossing, and the second time fifty feet nearer it. He testified that at neither time did he see or hear the train, and that, although he listened for signals, none were given. He also testified that he knew that the train was due at or

near the time, perhaps a little late, and that he was on the lookout for it. He testified that he knew of the custom to give the signals for the crossing by bell and whistle, and that as he approached he was listening for them. While the evidence tends strongly to show that, had he looked at a point within fifty feet of the track, he might have seen the approaching train in time to have avoided the accident, there also is evidence tending to show that because of the downward slope of the lane over which he was traveling, at a point fifty-seven feet from the rail, the road was about three feet below the level of the rails, and at thirty feet it was about twenty inches below; there being an upward incline to the track from a point about one hundred and fourteen feet to the west. The pile of ties to which reference has been made may not have interfered with his view so as to have been the means of leading him into danger. His own testimony is to the effect that it probably would not have done so. We think it may be fairly concluded from all the evidence that had the driver of the team been constantly on the lookout, the approaching train would have been discovered before it was too late to avoid accident. But this is not the sole test.

He had the right to expect a compliance with the custom of giving signals at that crossing, and if he listened and heard nothing there was presented a question for the jury to determine whether he was at the time exercising **3. SAME: signals: contributory negligence: evidence.** due care. *Harper v. Barnard*, 99 Iowa, 159; *Schulte v. C., M. & St. P. Ry.*, 114 Iowa, 94; *Willfong v. O. & St. L. Ry.*, 116 Iowa, 548; *Dusold v. C. G. W. Ry.*, 162 Iowa, 441.

The rule above stated is not intended as a means for excusing one from the exercise of ordinary care, a duty which is at all times imposed by law upon one approaching a railway crossing which is dangerous, but it is an element of fact or circumstance entering into the ultimate question whether such duty was observed. Cases arise where such reliance may not be placed upon the railroad company to meet that duty, and

some such have been cited by appellant; others, and among them those which we have cited, where, when the failure to give the signals creates a feeling of security in the traveler approaching the crossing, such should be permitted to be considered with the other facts and circumstances in reaching a conclusion of fact upon the question of contributory negligence.

Considering the facts presented in this case, the rate of speed at which the train was moving being forty or forty-five miles an hour, using no steam, with no exhaust, the claimed absence of signals, which the jury found were not given, the fact that the driver looked twice as he approached the track and discovered no danger, that he was listening for the usual signals and did not hear them, together with what the evidence shows to be the topography of the situation, which is fairly to be considered, there is presented a condition which does not permit the finding that no other conclusion than that of his own negligence could reasonably be reached.

The record is such that we must find that there was no error on the part of the trial court in submitting the case to the jury, and the judgment is *Affirmed.*

LADD, C. J., and DEEMER and GAYNOR, JJ., concur.