ROBERT T. COONLEY, Receiver, Appellee, v. FRANK O. LOWDEN et al., Trustees, Appellants.

No. 46316.

FEBRUARY 8, 1944.

REHEARING DENIED APRIL 7, 1944.

C. F. Johnston, of Sheffield, and J. G. Gamble and A. B. Howland, both of Des Moines, for appellants.

James E. Coonley, of Hampton, for appellee.

GARFIELD, J.—The nominal plaintiff is Coonley, as receiver for Borcherding, the injured man and driver of the automobile which collided with the train. Defendants are trustees of the railroad. We will refer to Borcherding as plaintiff and the railroad as defendant.

The collision occurred about 8 a. m. on November 26, 1941, at the intersection of First Avenue N. W. and the Rock Island tracks in Hampton. Plaintiff, a carpenter, aged sixty-four, was

driving his 1932 Chevrolet west. The passenger train came from the north on the east track. There were three tracks at this crossing. Two charges of negligence against defendant were submitted to the jury: failure to signal approach of the train, and its excessive speed. No claim is made that the evidence was insufficient to warrant a finding that the speed of the train was excessive or that the bell required by statute and the whistle were not sounded. The train was almost four hours late.

 I. Defendant states its first proposition substantially thus:

"The evidence affirmatively establishes that there were no substantial obstructions to the view of Borcherding, and that had he looked to the north at any point within 125 feet of the crossing, he must have discovered the approaching train. Under such circumstances, his testimony that he looked but did not see the train convicts him of contributory negligence as a matter of law."

The record, viewed in the light most favorable to plaintiff, does not support defendant's contention that there were no substantial obstructions to plaintiff's view. For five years plaintiff had lived a little over a block east of the crossing in a house facing east. The crossing is near the northwest edge of Hampton. Only about six houses are west of the tracks. Plaintiff had not driven over this crossing very often. He generally used the crossing a block south, on paved primary Highway No. 10. The street in question is graveled. Aside from plaintiff's house, in the southeast corner of the block, there are three houses in that block facing the north side of the street on which plaintiff drove. In the southwest corner of the block is the Windelow house, about 150 feet east of the railroad. West of the Windelow house and parallel to the railroad is a north-and-south street extending south to Highway 10. West of this street is railroad ground on which are the depot and other railroad buildings.

One hundred fifty-two feet north of the center of the crossing and just east of the track is a motorcar house, 8 by 7 feet and 6 feet high. Thirty-two feet north of this shed is the signal-maintainer's office and tool house, 20 by 10 feet. Plaintiff estimated the height of this building at 14 to 15 feet. Defendant's

section foreman testified it measures 12½ feet high. Ten feet north of this building, is a tool house, 16 by 10 feet by 11 feet high. One hundred seventy-five feet north of the crossing, about even with these buildings, the track turns to the northwest. These buildings, therefore, obstruct the view of a train from the north much more than if the rails continued on more nearly to the north. Less than 100 feet south of the crossing and just east of the track was the passenger depot, about 22 feet high, which obstructed the view to the south.

Traveling west, the view of the railroad to the northwest is partially obstructed by two good-sized trees southwest and south of the Windelow house. There was a pile of wood 10 feet high west of this house. There is much testimony regarding weeds 4 to 6 feet high, bushes and brush on railroad ground west of the Windelow house, that obstructed plaintiff's view. ''The weeds were all around there on the railroad ground.'' Some of the bushes were about 15 feet high. Twenty to 25 feet east of the track, and about 15 feet north of the sidewalk on the north side of the street, a section worker's model-A Ford was parked, parallel to the sidewalk. Testimony for plaintiff is that the section worker's automobile obstructed the view, partly because the ground on which it stood was 1½ to 2 feet higher than the road.

Plaintiff testified that he drove about ten miles an hour; he could stop his car in about 10 feet; his motor made no particular noise; the south window of his car was open a little; his north window was half open, his car windows were clear. ''As I left my house that morning, I was looking for trains. *I was listening for trains from the time I left the house up until the accident.*'' He heard no bell, whistle, or other warning at any time. (At least four presumably disinterested witnesses also so testified.)

As he came out from behind the Windelow house plaintiff looked to the northwest. Bushes and weeds obstructed his view. Plaintiff testified:

''There was a lot of brush there so you couldn't see that train * * * I am sure that I looked to the north before. I got 30 feet from the track. * * * I did look to the north about as I

came up toward * * * this north and south roadway. * * * [This would be about 100 feet east of the track.] I didn't see no train. * * * After you get out from behind the Windelow house, there was weeds there and trees that prevented my view of the tracks at that point. * * * As you go further west them buildings prevent you from having a view of a train coming around that curve from the northwest.''

Plaintiff and his son both testified that the first clear, unobstructed view to the south was from a point about 30 feet east of the crossing and the first clear view to the north was from 15 to 20 feet east of the crossing. "It was about 15 feet off from the track, some place around there.'' Plaintiff testified:

"As I came up to the crossing, I looked south first. There wasn't any train coming from that direction. I looked north, and I was about 15 feet off from the track and I seen the train * * * a little less than 100 feet away. * * * I don't know what I did next * * * I know I turned my car to the south a little bit. * * * I don't have any recollection of what happened from the time I saw the train until I came to, underneath the automobile.''

Plaintiff's testimony is that he looked north the last time as soon as his view in that direction was unobstructed. The train struck the right rear of the car, which came to rest about 50 feet south of the crossing. Plaintiff was seriously and permanently injured.

Three important witnesses for defendant, paid by its claim investigator to make observations two days after the collision, testified that from a point about 75 feet east of the crossing the three railroad buildings along the track were a substantial obstruction to the view to the northwest.

In general, we have held that where the view of the railroad is obstructed *or* where there are diverting circumstances, the question of contributory negligence is usually for the jury. In Artz v. Chicago, R. I. & P. Ry. Co., 34 Iowa 153, 160, 161, through Cole, J., this court said:

"We have given to the cases upon this subject, in the different States, a somewhat extended examination, and almost

without exception they concur in holding, that where a person, knowingly about to cross a railroad track, may have an unobstructed view of the railroad, so as to know of the approach of a train a sufficient time to clearly avoid any injury from it, he cannot, as a matter of law, recover * * *. [Citing numerous cases.]

"But, if the view of the railroad, as the crossing is approached upon the highway, is obstructed by any means, so as to render it impossible or difficult to learn of the approach of a train, or there are complicating circumstances calculated to deceive or throw a person off his guard, then, whether it was negligence on the part of plaintiff or the person injured, under the particular circumstances of the case, is a question of fact for the jury." (Citing many cases.)

The above statement has been frequently reiterated by many different courts. For seventy years we have adhered to the rule of the Artz case. See, for example, Winey v. Chicago, M. & St. P. Ry. Co., 92 Iowa 622, 625, 626, 61 N. W. 218 (opinion by Deemer, J.) ; Bush v. Chicago, R. I. & P. Ry. Co., 216 Iowa 788, 793, 247 N. W. 645 (by Mitchell, J.) ; Markle v. Chicago, R. I. & P. Ry. Co., 219 Iowa 301, 305, 257 N. W. 771 (Kintzinger, J.). See, also, Selensky v. Chicago G. W. Ry. Co., 120 Iowa 113, 117, 94 N. W. 272 (McClain, J.). Applying this rule to this case, the question of contributory negligence was for the jury.

A traveler approaching a railroad must look when by looking he can see. A traveler is required to look for approaching trains within a reasonable distance from the crossing, but not at any particular place nor at all points. It is ordinarily for the jury to determine whether he selected a proper place for making observation and otherwise used ordinary care for his safety. When the jury could find that a traveler looked within a reasonable distance from the crossing, a court will not ordinarily say, as a matter of law, he was guilty of contributory negligence because he did not look again from some other designated point from which he might possibly or probably have discovered the train. That some other course might have been better or safer or have avoided the collision does not establish, as a matter of law, contributory negligence. A plaintiff is not to be judged by what

might now appear to have been the safer course. The law does not require perfect care, but only ordinary care under the attendant circumstances. Nor does the law specify precisely what must be done in the exercise of such care.

Among the numerous cases which affirm the above propositions are Markle v. Chicago, R. I. & P. Ry. Co., 219 Iowa 301, 304, 257 N. W. 771; Anderson v. United States R. R. Admn., 203 Iowa 715, 718, 211 N. W. 872 (Vermilion, J.); Nederhiser v. Chicago, R. I. & P. Ry. Co., 202 Iowa 285, 290, 291, 208 N. W. 856 (DeGraff, C. J.); Alitz v. Minneapolis & St. L. R. Co., 196 Iowa 437, 441, 193 N. W. 423 (Weaver, J.); Butterfield v. Chicago, R. I. & P. Ry. Co., 193 Iowa 323, 326, 185 N. W. 151 (Weaver, J.); Wiese v. Chicago G. W. Ry. Co., 182 Iowa 508, 511, 166 N. W. 66 (Ladd, J.); Case v. Chicago G. W. Ry. Co., 147 Iowa 747, 751, 752, 126 N. W. 1037 (Deemer, C. J.).

Plaintiff had a right to assume, unless he knew or should have known otherwise, that the train would signal its approach by ringing the bell as required by statute and, if required by ordinary care, by sounding a whistle. Saeugling v. Scandrett, 230 Iowa 153, 156, 296 N. W. 787, 788 (Sager, J.); Anderson v. United States R. R. Admn., 203 Iowa 715, 717, 211 N. W. 872; Barrett v. Chicago, M. & St. P. Ry. Co., 190 Iowa 509, 515, 175 N. W. 950, 188 N. W. 670 (Ladd, J.). It appears that plaintiff knew there was a city ordinance limiting the speed of trains to twenty-five miles per hour when approaching crossings in Hampton. Plaintiff also had a right to rely, in the absence of knowledge or notice to the contrary, upon compliance by the railroad with this ordinance. Butterfield v. Chicago, R. I. & P. Ry. Co., 193 Iowa 323, 328, 185 N. W. 151; Platter v. Minneapolis & St. L. R. Co., 162 Iowa 142, 158, 143 N. W. 992 (Deemer, J.); Case v. Chicago G. W. Ry. Co., 147 Iowa 747, 751, 126 N. W. 1037; 3 Blashfield, Cyclopedia of Automobile Law and Practice, Perm. Ed., 160, section 1758. Ordinarily, a party need not anticipate another's negligence. 38 Am. Jur. 871, section 192.

We have repeatedly held that it is difficult to divorce the reciprocal duties of railroad and traveler and it is proper to consider, on the issue of contributory negligence, the right of the traveler to rely upon the railroad's compliance with the law.

This is especially true of requirements designed to warn the traveler of the train's approach. True, the failure to signal does not relieve the traveler from exercising ordinary care on his part. But the absence of a warning signal may have the effect of lulling the mind into a sense of security. The testimony that no signal was given is therefore properly to be considered on the question of contributory negligence. See authorities in preceding paragraph; also, Nederhiser v. Chicago, R. I. & P. Ry. Co., 202 Iowa 285, 291, 208 N. W. 856; Haven v. Chicago, M. & St. P. Ry. Co., 188 Iowa 1266, 1269, 175 N. W. 587 (Salinger, J.); Davitt v. Chicago G. W. Ry. Co., 164 Iowa 216, 222, 145 N. W. 483 (Withrow, J.); Dusold v. Chicago G. W. Ry. Co., 162 Iowa 441, 449, 142 N. W. 213 (Gaynor, J.); 3 Blashfield, Cyclopedia of Automobile Law and Practice, Perm. Ed., 155, 156, section 1757.

Defendant cites, in support of its first proposition, Nurnburg v. Joyce, 232 Iowa 1244, 7 N. W. 2d 786; Hitchcock v. Iowa Southern Util. Co., 233 Iowa 301, 6 N. W. 2d 29; Meier v. Chicago, R. I. & P. Ry. Co., 224 Iowa 295, 275 N. W. 139; and Darden v. Chicago & N. W. R. Co., 213 Iowa 583, 239 N. W. 531. They are not in point.

In the Nurnburg and Meier cases, the traveler had an unobstructed view for about 150 feet before the crossing was reached and would have seen the train had he looked. In the Hitchcock case, plaintiff conceded that decedent saw the train when he was 250 feet from the crossing; he was driving so fast he was unable to avoid the collision. The basis of the Darden decision is thus stated in the opinion, at page 586 of 213 Iowa, page 533 of 239 N. W.:

"Where the physical facts are such that, had the plaintiff looked for a train at the distance from the track where she said she did look, she would have seen the approaching train, her failure to see the train shows that she did not look, as she said she did, and she was guilty of contributory negligence as a matter of law."

The rule of the Darden case appears to be the theory on which defendant here argues that plaintiff was contributorily negligent as a matter of law, in that had he looked to the north

"at any point within 125 feet of the crossing, he must have discovered the approaching train." The argument is not applicable under the facts here.

Carlin v. Thompson, 234 Iowa 469, 475, 476, 12 N. W. 2d 224, 227, is also readily distinguishable. The majority opinion there points out it was "quite conclusive that for the last 300 feet covered by plaintiff before the collision, he must have had a practically unobstructed view of the train." It is also pointed out that because of the peculiar fact the plaintiff was concededly traveling about three times as fast as the train, evidence of obstructions to the view was unimportant—"evidence that would be immensely significant if the respective rates of speed of the two vehicles were reversed." Here there is evidence the respective rates of speed are reversed.

It might be argued plaintiff was negligent in failing to discover the train sooner or in not avoiding the collision after having discovered it. Of course, a jury could so find, but we cannot so hold as a matter of law. There is substantial evidence that plaintiff looked both south and north as soon as his view in either direction was unobstructed. It was his duty to look in both directions. 3 Blashfield, Cyclopedia of Automobile Law and Practice, Perm. Ed., 138, section 1746. He had previously looked to the north, from what the jury could find was a reasonable place, and had seen no train. The physical facts are not such that he must have seen the train. He says he was constantly listening for a train. Under our decisions, as defendant concedes, plaintiff was not required, as a matter of law, to stop before going on the crossing. Love v. Fort Dodge, D. M. & So. R. Co., 207 Iowa 1278, 1286, 224 N. W. 815 (Kindig, J.), and cases cited.

We cannot say, as a matter of law, that plaintiff was negligent in not avoiding collision with a train which was less than 100 feet away, that he discovered when about 15 feet from the crossing. True, he says he could stop, traveling at ten miles an hour, in 10 feet. We have held, however, "when speeds and distances are spoken of, we are dealing with estimates and not with certainties." Short v. Powell, 228 Iowa 333, 335, 291 N. W. 406, 407 (Sager, J.). "We are dealing in fractions of seconds,

and courts cannot say as a matter of law which of the two parties was to blame.'' Eby v. Sanford, 223 Iowa 805, 807, 273 N. W. 918 (Mitchell, J.).

See, also, Hines v. Chicago, M. & St. P. Ry. Co., 196 Iowa 109, 115, 194 N. W. 188 (DeGraff, J.); Case v. Chicago G. W. Ry. Co., 147 Iowa 747, 752, 753, 126 N. W. 1037. Courts cannot say that the ordinary person, under such circumstances, would not require some time to marshal his faculties and decide what should be done. Brakes cannot always be applied instantly. We have recognized a ''thinking distance''—that is, the distance traveled while a motorist thinks about stopping his car. Luse v. Nickoley, 231 Iowa 259, 264, 3 N. W. 2d 503, 505 (Mitchell, J.). At ten miles an hour plaintiff would cover the 15 feet between his point of observation and the rails in approximately one second. Plaintiff came within a fraction of a second of clearing the crossing before he was struck.

The decisions heretofore cited in support of this opinion fully sustain our conclusion that the issue of contributory negligence was for the jury. Special attention is called to Nederhiser v. Chicago, R. I. & P. Ry. Co., 202 Iowa 285, 208 N. W. 856; Hines v. Chicago, M. & St. P. Ry. Co., 196 Iowa 109, 194 N. W. 188; Lutz v. Davis, 195 Iowa 1049, 192 N. W. 15 (Faville, J.—not previously cited); Barrett v. Chicago, M. & St. P. R. Co., 190 Iowa 509, 175 N. W. 950, 180 N. W. 670; Davitt v. Chicago G. W. R. Co., 164 Iowa 216, 145 N. W. 483; Selensky v. Chicago G. W. Ry. Co., 120 Iowa 113, 94 N. W. 272. Except that the dissent of Salinger, J., is noted to a supplemental opinion in the Barrett case, supra, we have cited no opinion to which there is a dissent or special concurrence. Except that the no-eyewitness rule is somewhat involved in the Barrett case and in Platter v. Minneapolis & St. L. R. Co., supra, 162 Iowa 142, 143 N. W. 992, we have cited no decision involving that rule. And in every case cited plaintiff had the burden to prove freedom from contributory negligence.

II. Defendant next complains of the refusal of a requested instruction on contributory negligence containing the statement:

''If the view is obstructed to his knowledge to such extent that ordinary care requires that his vehicle be stopped before

going upon the track, then a failure to stop such vehicle constitutes contributory negligence.''

In view of the instructions given, the ruling was not error. The jury was told, among other things, that plaintiff was required to take such steps for his own safety as any person of ordinary prudence under like circumstances; such a person must realize he is approaching a danger zone and bring his car under corresponding control; if there is danger of collision it is for the motorist to stop and wait until the train has passed in safety; ordinary care is commensurate with the danger involved, if the danger is great, the care to be exercised must be great; reasonable care in approaching a railroad crossing is a high degree of care; a person is not permitted to gamble with fate or assume on general principles that he can cross with safety. These instructions were sufficient. See, as bearing on this matter, Love v. Fort Dodge, D. M. & S. R. Co., 207 Iowa 1278, 1285, 1286, 224 N. W. 815, and cases cited.

III. Defendant complains of the receipt in evidence of six photographs plaintiff caused to be taken in July 1942. We are told that foliage on the trees and vegetation were not then in the same condition as at the time of the collision.

There were received in evidence six photographs said to have been taken two days after the collision under the supervision of defendant's claim investigator. These photographs plainly show there was then no foliage on the trees. Plaintiff and his son both testified that defendant's exhibit 3 shows the condition of the foliage on the trees on November 26, 1941. Several witnesses testified there was then no foliage. The record shows no claim to the contrary.

Before defendant's photographs were offered, plaintiff offered and there were admitted the six photographs of which defendant complains. The photographer, who had lived in Hampton fourteen years, testified that each picture, with the exception of the foliage and an automobile in some of the pictures, was a fair representation of the view from a point 4½ to 5 feet above the ground where the camera was located (stating the number of feet from the crossing and in what direction) on the date of the collision. Plaintiff also verified the photographs as fair

representations of the view at the time of the collision, with the exception of the foliage and the automobile. Of course, the credibility of this testimony was for the jury. One of these photographs was taken from a place on the track a block north of the crossing and merely shows the view toward the depot. Another was taken from a point 225 feet east of the crossing and shows the east side and part of the south side of the Windelow house. Neither of these two pictures was prejudicial to defendant.

The other four photographs were taken from points in the road 15 to 125 feet east of the crossing. In one of these four pictures is an automobile placed where testimony shows the section worker's car was parked at the time of the collision. The car shown in the picture is a late model "two door," which we may well take judicial notice was lower and would obstruct the view less than the section worker's "model A." Another picture shows a small part of this car. That these two photographs were not rendered inadmissible because they show all or part of this car, see Dice v. Johnson, 198 Iowa 1093, 1099, 199 N. W. 346; annotation 27 A. L. R. 913, 916; 3 Jones, Commentaries on Evidence, Second Ed., 2577, 2579, section 1418, and cases cited n3. Another picture shows a small part of another car which happened to be parked southwest of the Windelow house when the photograph was taken. No significance is claimed for this car.

One of these four pictures (exhibit 1) shows a few trees with foliage in the Windelow yard. The other three photographs also show a few trees with foliage east and north of the railroad buildings, 150 feet or more north of the crossing. But the jury was plainly told these pictures did not accurately show the condition of the foliage at the time of the collision, and could not have been misled by the fact there was foliage shown in the pictures.

Plaintiff's photographs also show some weeds. As stated, testimony for plaintiff is that there were weeds 4 to 6 feet high northeast of the crossing at the time of the collision. That there were some weeds about that high plainly appears from pictures taken by defendant, exhibits 5, 6, and 8. Naturally, the exact location, extent, and height of these weeds were disputed. Several witnesses testified fully on these matters.

None of the twelve pictures shows the wood pile west of the Windelow house. In this respect, all the pictures are favorable to defendant. Further, plaintiff testified and the jury could have found there were more and higher weeds at the time of the collision than are shown in plaintiff's pictures taken the following July. If this testimony were believed, plaintiff's photographs in this respect were not prejudicial to defendant.

Except for seasonal changes in foliage and weeds, and the automobile and wood pile (the section worker's car is not shown in defendant's photographs) there is no claim of changed conditions between the time of the collision and the taking of plaintiff's pictures. In fact, it affirmatively appears from defendant's witnesses there was no such change. The railroad buildings just east of the track constituted a substantial obstruction to a view of the train. It is not contended plaintiff's photographs do not correctly show these buildings.

At the conclusion of the evidence, on October 22, 1942, at the request of both sides, the jury went to view the scene of the collision, a few blocks from the courtroom. The condition of foliage and vegetation at that time must have been generally similar to that on November 26, 1941. That the jury's view of the premises tended to obviate any prejudice to the railroad in the admission of plaintiff's photographs, see 9 Blashfield, Cyclopedia of Automobile Law and Practice, Perm. Ed., 867, section 6368; Scott, Photographic Evidence (1942), 581, 588, section 671.

A ruling on the admissibility of photographs will not be interfered with on appeal except upon a clear showing of abuse of discretion. Ingebretsen v. Minneapolis & St. L. R. Co., 176 Iowa 74, 83, 155 N. W. 327, and cases cited. The trend of authority is to vest more discretion in the trial court in a matter of this kind. Even substantial changes in the scene will not necessarily exclude a photograph where the changes can be explained. 32 C. J. S. 623, section 715. So far as we can find, we have never reversed a case because of the admission of photographs. Other courts have also been slow to reverse because of such a ruling. See, for example, Bruce v. Hanks, 277 Mass. 268, 178 N. E. 728, 729; Skaling v. Sheedy, 101 Conn. 545, 126

A. 721, 36 A. L. R. 540, 544. Reversible error does not neces-sarily result from the admission of a photograph even though it could properly have been excluded. Nolte v. Chicago, R. I. & P. Ry. Co., 165 Iowa 721, 729, 730, 147 N. W. 192.

In 20 Am. Jur. 611, 613, sections 731, 734, it is said:

"Photographs of the scene of an accident taken at or near the time are not always obtainable, and the only practical rule would seem to be that the changes must not be such as to destroy the substantial identity and that the changes, whatever they may be, should be carefully pointed out and brought to the jury's attention. * * *

"A mere change in the appearance of a locality, arising from photographs having been taken at different seasons of the year, is open to explanation."

Applying the foregoing tests here, the reception of these photographs is insufficient basis for reversal. Riggs v. Pan-American Wall Paper & Paint Co., 225 Iowa 1051, 1057, 1058, 283 N. W. 250; Salkin v. Erie R. Co., 3 Cir., N. J., 23 F. 2d 677; Dyson v. New York & New England R. Co., 57 Conn. 9, 24, 17 A. 137, 139, 14 Am. St. Rep. 82, 86, where it is said, "* * * the change in the appearance of the locality made by the falling of the leaves from the trees was of course open to explanation."; Snibbe [Surratt] v. Robinson, 151 Md. 658, 135 A. 838, 50 A. L. R. 280, 283; State v. Hines, 148 Minn. 393, 182 N. W. 450; Smith v. Wilson, Mo. App., 296 S. W. 1036, 1040, 1041; Beards-lee v. Columbia Twp., 188 Pa. St. 496, 41 A. 617, 68 Am. St. Rep. 883, 885.

IV. On cross-examination, plaintiff's witness Mrs. Blanchard said she had talked to no one about her testimony. On redirect, she said she had talked to defendant's adjuster, Campbell. This record then follows:

"Q. And he tried to get you to sign a statement saying that you heard a bell and whistle? A. Well, I don't know just how he did put it, now. He had a statement that he made out."

On recross-examination, defendant's counsel produced an unsigned statement on a railroad form, exhibit 7, and asked several questions regarding it. He had refused, upon plaintiff's

request, to produce the paper unless so ordered. Apparently the witness was taking some time to examine the paper. The court then inquired, ''Well now, gentlemen, what is there about this that can possibly prove or disprove anything in this case?'' Defendant's counsel replied that plaintiff's counsel had questioned the good faith of the adjuster. He then offered the unsigned statement in evidence. Plaintiff's objection of hearsay was sustained. The statement recited among other matters, ''I did not hear the train whistling * * *.''

It seems to us that the mere asking by plaintiff's counsel of the question we have quoted was insufficient basis for the admission of this statement.which was clearly hearsay. The witness did not give an affirmative answer to the question and testified to nothing that made this unsigned statement admissible. Further, the offer of additional evidence that a whistle was not sounded would seem to be of doubtful benefit to defendant. In any event, the exhibit was properly excluded because it was not identified as the statement prepared by Campbell which the witness was asked to sign. Perhaps the court should not have interrupted the examination, but its inquiry is insufficient basis for reversal.

V. Part of Instruction No. 7 states, in substance, that while there is no statute requiring it, the peculiar circumstances surrounding a crossing may be such that the sounding of a whistle may be necessary in the exercise of ordinary care for the protection of the public, and that if reasonable care under the circumstances here required the sounding of a whistle and no whistle was sounded, a finding of negligence would be warranted.

Section 8018, Code, 1939, requires the sounding of a whistle and bell at road crossings, but provides that in cities or towns the whistle may be omitted unless required by ordinance or resolution of the council. Because of this proviso in the statute, defendant contends it is under no duty to whistle for a crossing in a city or town, unless required by ordinance or resolution. As defendant concedes, however, our decisions are contrary to its contention. The instruction correctly states the law. The circumstances surrounding the crossing here were sufficient to warrant the submission of this charge of negligence. Glanville v. Chicago, R. I. & P. Ry. Co., 196 Iowa 456, 460, 193 N. W. 548;

Anderson v. United States Ry. Admn., 197 Iowa 1, 196 N. W. 584. See, also, Glanville v. Chicago, R. I. & P. R. Co., 190 Iowa 174, 182, 180 N. W. 152; Thomas v. Des Moines Ry. Co., 231 Iowa 1003, 1007, 1008, 2 N. W. 2d 655, 657.

■ VI. In rebuttal, over objection, Wolf testified that on the day following the accident, or four days later, he observed burning on railroad ground northeast of the crossing. This testimony was apparently offered in an attempt to show that some of the weeds had been burned between the time of the collision and the taking of photographs offered by defendant. On cross-examination it developed that the burning was two blocks or more north of the crossing where the collision occurred. Defendant thereupon moved to strike Wolf's testimony. The overruling of the motion is assigned as error.

Since the cross-examination disclosed that the burning was at some distance from the scene of the collision, the evidence was not sufficiently material and relevant to be of probative value and defendant's motion should have been sustained. However, little if any prejudice could have resulted to defendant from the evidence and the ruling is insufficient basis for reversal.

No complaint is made of the size of the verdict. As defendant in effect concedes, it is for a comparatively small amount, considering the extent of plaintiff's injuries.—**Affirmed.**

BLISS, OLIVER, and MULRONEY, JJ., concur.

MULRONEY, J., also specially concurs as to Division I.

SMITH, C. J., dissents from Division I, and concurs in the other divisions of the opinion.

WENNERSTRUM, J., dissents from Division III, and concurs in the other divisions of the opinion.

HALE, MILLER, and MANTZ, JJ., dissent from Divisions I and III.

MULRONEY, J. (specially concurring)—I will say a few words to emphasize my agreement with Division I of Justice Garfield's opinion.

Plaintiff testified that in his best judgment he was prevented from having a view of the track or train coming from the

north when he was 30 feet east of the crossing. He stated that he did look to the north several times before he got to this point 30 feet from the crossing.

Plaintiff stated he did not know how far north of the crossing he could see when he was 30 or more feet east of it, but he stated:

"I probably could see some distance, and I didn't see no train coming."

He stated on cross-examination that the brush and weeds and things that obstructed his view while he traveled west from the point 30 feet east of the crossing were not like a "solid brick wall." I do not think we can say that plaintiff was negligent as a matter of law because he traveled these last 30 feet at ten miles an hour or less and then failed to stop before proceeding across the tracks.

With due deference, I disagree with Justice Smith, who seems to be of the opinion that ordinary care required plaintiff to stop. I think it is significant that defendant does not argue that the court should have so ruled. In its argument on the proposition that the motion for directed verdict should have been sustained because of plaintiff's contributory negligence, defendant argues that the evidence affirmatively establishes that there were no obstructions to plaintiff's view to the north at any point 125 feet east of the crossing and, under such circumstances, his testimony that he looked but did not see the train convicts him of contributory negligence as a matter of law.

Without reviewing the evidence, I feel that the case was close on this point. But, assuming an evidence conflict on whether plaintiff's view was obstructed, defendant only argues for an instruction to the jury outlining the obligation to stop before crossing the tracks. In other words, defendant concedes in argument that the failure to stop presented a jury question, for counsel for defendant states in his brief:

"Some courts of last resort, notably those in Pennsylvania and, for a time, the Federal courts, have held that where a traveler is aware that his view of approaching trains is obscured, ordinary care requires him to stop his vehicle in close proximity

to the track, and if he fails so to do, he may not recover. This 'stop-to-look-and-listen' rule has not found judicial approval in Iowa except in the case of Dean v. C. B. &. Q. Ry. Co., 211 Iowa 1347, where, under the peculiar circumstances and conditions there presented, this court held the plaintiff negligent because he did not stop his vehicle before going upon the track. From an early day, it has been the rule in this state that as trains may rightfully pass at any time, the exercise of ordinary care requires that the traveler shall look and listen, and if, to his knowledge, his view is interfered with so that he cannot see without stopping before driving upon the track, then the jury may impose upon him the duty of stopping to look before going upon the crossing. Based upon these authorities, we say that the rule in Iowa is that if the view is obstructed, to the knowledge of the traveler on the highway, the jury may say that ordinary care requires him to stop before driving upon the track, for the purpose of making observations.''

I agree with the foregoing statement of the Iowa law. I also feel the jury could have found plaintiff guilty of contributory negligence by failing to stop, under the instructions given.

SMITH, C. J. (dissenting)—I dissent from Division I of the majority opinion. The record, as I read it, utterly fails to show any direct or circumstantial evidence of freedom from contributory negligence sufficient to carry that issue to the jury. The burden was on plaintiff to make such affirmative showing. He was aided by no presumption. Our province is not to determine whether he was in fact negligent, but to say whether there is evidence to support a jury finding that he was *not* negligent. (I will use the term plaintiff to refer to the driver of the car whenever the context so indicates.)

It is well settled that it is not the duty of the court to submit the case to the jury merely because there is *some* evidence produced by the party having the burden of proof. Such evidence must be ''of such character that it would warrant a verdict'' in favor of the party introducing it. Bales v. Bales, 164 Iowa 257, 145 N. W. 673. It is also well settled that the record must be viewed in the light most favorable to the one against whom the motion to direct is aimed. With these princi-

ples in mind, let us examine the testimony of plaintiff and his witnesses and the photographs offered in his behalf to determine how he attempts to sustain the burden of proof which the law places upon him.

Plaintiff had lived in Hampton, Iowa, seventeen years. For more than five years immediately preceding the accident he had lived only a block or two east of the crossing where it happened and on the same street. He left home the morning of the accident about eight o'clock, central standard time. It was a "clear, calm, early winter morning," November 26, 1941. He traveled west, a little uphill all the way from his house to the crossing, and at no time more than ten miles per hour. He says he could stop in 10 feet. Ordinary human experience would probably say his estimate is, at least, conservative. He shifted into high gear at approximately 125 feet east of the tracks and did not thereafter change back into low or intermediate.

A series of photographs was introduced as a part of plaintiff's case. One, taken about 125 feet east of the crossing and looking to the northwest, shows the view quite obstructed by trees, weeds, and buildings. Another, taken at a point 75 feet east of the crossing, shows the obstructions much more serious and nearly completely shutting off the view. At a point about 25 or 30 feet the view is still obstructed, but due apparently to the presence of a parked car hereinafter referred to. The picture taken 15 or 20 feet from the crossing shows an unobstructed view to the north and west for at least 600 feet. Plaintiff's oral evidence tends to lessen, rather than increase, the seriousness of these obstructions.

He testifies:

"I was listening for trains from the time I left the house up until the accident. I had stopped for a good many trains there already. * * * As I came up to the crossing, I looked south first. There wasn't any train coming from that direction. I looked north, and I was about 15 feet off from the track and I seen the train. I think the train was then less than 100 feet away—a little less than 100 feet, somewhere around there. I don't know what I did next—when I seen the train, I was all done. I thought that it was the last. That is all I thought, and

I didn't think any more after that. I know I turned my car to the south a little bit. The rear end of my car was struck by the train on the right side.''

On cross-examination he says:

''The engine of my car was not making any particular amount of noise, and I was driving at a low speed in high gear. There was nothing about the automobile that would prevent me from hearing any sounds. There were no other vehicles on the road, and there were no people around the crossing or in the vicinity that I saw. The road was a good graveled roadway. There were no ruts or chuck holes on the roadway itself. There wasn't anything about the road that required any particular attention in driving a car any more than on any other graveled roadway. There wasn't anything that distracted my attention that I can now recall.''

Plaintiff claims there was an automobile parked, extending straight east and west, and located across and 10 to 20 feet from the sidewalk on the north side of the street and east of the tracks about 20 or 25 feet. He thinks that obstructed his view to the north when he was about 30 feet from the track.

One of plaintiff's witnesses saw the accident through the window of a house on the other side of the track and on the north side of the street. She says:

''The first thing I noticed was the sizzling noise like when the brakes on a train are applied, and then I looked out the east dining room window. When I looked out, I could just see the train coming past my garage, I would say right in front of the railroad tool house. * * * Shortly after that, I observed an automobile coming up the hill, going west. When I first noticed the car, I would say it was about where the driveway turns up on the west side of the Windelow house [approximately 125 feet east of the crossing]. I know the car was coming up that little hill there. * * * That car didn't stop at any time. It didn't change its direction.''

It is to be borne in mind that plaintiff was admittedly acquainted with this crossing. He ''had stopped for a good many

trains there already." He says he had "crossed it a good many times," though he also testifies:

"I was well acquainted with the neighborhood there. I had driven over the crossing where the accident happened, but I tell you it wasn't very often that I went there, because I usually went south up to No. 10 and went west from there."

That morning, as he came past the obstructions, which continued more or less up to a point 15 or 20 feet east of the crossing, he must have been fully aware of them and must have known, if he was thinking, that he would have to make his observation when he came to the point where the view was open: and he must have known it would be useless to do so with his car in motion to such a degree as to make it impossible for him then to stop if a train was discovered approaching.

It is suggested that plaintiff had a right to rely upon compliance by defendant with the city speed-regulating ordinance. There is no testimony, however, that he did rely on it, and there is no evidence that the train was violating it.

The majority opinion says: "Plaintiff's testimony is that he looked north the last time as soon as his view in that direction was unobstructed." Again: "There is substantial evidence that plaintiff looked both south and north as soon as his view in either direction was unobstructed." Both references are to his testimony of observations made by him approximately 15 feet from the tracks. It is manifest that looking at that point could be of no value if he was unable, because of the motion of his car, to stop. He did not shift gears or slow down as he approached the crossing, and he testifies to no facts which in any way explain his failure to pause, and stop, if necessary, in order to ascertain if he could safely cross. He was partly across before he was hit, as the evidence shows that it was the rear right side of his car that was struck by the train.

In argument some point is made of the fact that the train was several hours late. There is no evidence that he was in any way misled by that circumstance. There is no evidence as to the speed of the train, certainly none to indicate that it was traveling at a high rate of speed, or that plaintiff was caught by reason of any unexpected speed of the train. Plaintiff's own witness says

the train was slowing down for the station, which is just south of the crossing on the east side of the tracks.

The foregoing fairly summarizes plaintiff's evidence bearing on the issue of freedom from contributory negligence. It also fairly presents his theory of the case, which is that his view of the railroad to the north (from which direction came the train that struck him) was obstructed until he was too close to avoid the collision. What was his duty, in these circumstances, as a reasonably prudent person?

The answer is found in our own decisions, repeated over and over, both in cases where plaintiff prevailed and those in which we held he had not sustained the burden. It is reduced to a succinct and accurate statement by the Corpus Juris text writer:

"Where the view or hearing of a traveler approaching a railroad crossing is so obstructed that he cannot otherwise satisfy himself whether it is prudent to cross, it is his duty, where he is familiar with the crossing or aware of such facts, to stop and look or listen before going upon the tracks * * *." 52 C. J. 309, section 1884, citing Dean v. Chicago, B. & Q. R. Co., 211 Iowa 1347, 229 N. W. 223; High v. Waterloo, C. F. & N. Ry. Co., 195 Iowa 304, 190 N. W. 331; Wilson v. Illinois Cent. Ry. Co., 150 Iowa 33, 129 N. W. 340, 34 L. R. A., N. S., 687; Moore v. Chicago, St. P. & K. C. Ry. Co., 102 Iowa 595, 71 N. W. 569; Nosler v. Chicago, B. & Q. Ry. Co., 73 Iowa 268, 34 N. W. 850; besides many decisions from other states.

Because the majority opinion ignores this thoroughly sound and well-established doctrine, let us quote from some of our own decisions.

In Payne v. Chicago & N. W. Ry. Co., 108 Iowa 188, 195, 78 N. W. 813, 816, we said:

"Under repeated and undisputed holdings of this court, it was the duty of the plaintiff to look and listen for trains before going on the crossing, and if, from any cause, he could not know, by looking or listening, while moving forward, whether or not a train was coming, he should have stopped until, by looking or listening, he did know that it was safe for him to cross."

There was no dissent.

In Darden v. Chicago & N. W. R. Co., 213 Iowa 583, 585, 586, 239 N. W. 531, 532, it is said:

"The undisputed testimony in the case shows that, if she had stopped her car 25 feet back from the crossing, she would have had a clear and unobstructed view for 360 feet to the south; if she had stopped 20 feet back, she would have a clear and unobstructed view for 510 feet; if she stopped 15 feet back, she would have a clear and unobstructed view for 760 feet; and if she had stopped 10 feet back, she would have a clear and unobstructed view to the south for 954 feet. * * * The duty is placed on the driver of an automobile to look and listen for trains * * * at the place where, by looking, she could have seen, and by listening, she could have heard the same."

See, also, the cases cited. The opinion was unanimous.

In Dean v. Chicago, B. & Q. R. Co., supra, 211 Iowa 1347, 1350, 229 N. W. 223, 224, we said:

"Stopping or starting an automobile in perfect working condition, with good brakes, going at a low rate of speed (which facts are all shown in the instant case), is a simple movement, requiring very little time or energy."

In that case the view was obstructed until the traveler was within "a few feet of the track." The opinion says, in conclusion:

"The fact is, however, that he did not stop, and * * * that, had he looked to the west all of the time while approaching the tracks, he could not have seen anything until his car was on, or nearly on, the tracks. Plaintiff must have known, under the circumstances, that, if he did not stop, and a train was approaching, which he could not see and could not hear, a collision would be inevitable."

Six judges concurred in the opinion and there was no dissent.

Quotations and citations could be multiplied. They are all to the effect that while there is no mandatory rule requiring the traveler to stop in all cases, he must do so if under *known* con-

ditions he cannot make the necessary observations for his own safety while continuing in motion toward the crossing.

There was no mechanical or physical reason shown why plaintiff here could not and should not have exercised the care instinctively practiced by every prudent pedestrian who starts to cross a busy thoroughfare before he enters the danger zone. The rule clearly applies to drivers of motor vehicles approaching railroad crossings:

"* * * where ordinary caution and prudence require it, as where the physical conditions are such as to make it necessary before he can safely cross the tracks, or where it is necessary to enable him to look and listen effectively * * * [the motorcar driver's] failure to stop before going on the crossing will constitute contributory negligence." 52 C. J. 310, 311.

See, also, Barnett v. Atchison, T. & S. F. Ry. Co., 99 Cal. App. 310, 278 P. 443.

The doctrine is frequently invoked in cases where the known obstructions are farther back away from the crossing, leaving a greater distance and a longer time within which to do whatever may be necessary to avoid collision if an oncoming train be discovered. In such cases it is sometimes rather a matter of reducing speed than of actually stopping to look and listen. The principle is the same.

"The law does not undertake to direct whether a traveler upon the highway shall first look to the right or to the left before crossing tracks, or to fix the place where observation shall be made. It *does* require that the traveler shall look at a place where he can see, *and that he shall then be in a situation to avoid injury by the operation of cars upon the tracks.*" Glessner v. Waterloo, C. F. & N. Ry. Co., 216 Iowa 850, 853, 249 N. W. 138, 139. (Italics supplied.)

See, also, Hitchcock v. Iowa Southern Util. Co., 233 Iowa 301, 6 N. W. 2d 29; Nurnburg v. Joyce, 232 Iowa 1244, 7 N. W. 2d 786; Beemer v. Chicago, R. I. & P. Ry. Co., 181 Iowa 642, 162 N. W. 43; Carlin v. Thompson, 234 Iowa 469, 12 N. W. 2d 224.

There are cases where plaintiff, confronted by an *unexpected danger*, might be entitled to a "thinking distance" in

which to collect his faculties enough to think about stopping his car. Luse v. Nickoley, 231 Iowa 259, 264, 3 N. W. 2d 503, 505. This is not such a case. Plaintiff was entering a zone of *known* danger from behind *known* obstructions. Under his own evidence and theory he had, up to that point, been unable to see up the track to the north. The very purpose of looking then was to see if a train was coming in order to avoid being hit. He should not be heard to plead surprise or emergency because a train was in fact approaching.

The majority opinion cites numerous cases. Six are recommended for special attention. In the cases of Nederhiser v. Chicago, R. I. & P. Ry. Co., 202 Iowa 285, 208 N. W. 856, Hines v. Chicago, M. & St. P. Ry. Co., 196 Iowa 109, 194 N. W. 188, and Lutz v. Davis, 195 Iowa 1049, 192 N. W. 15, there were diverting circumstances sufficient to make them jury cases. In Barrett v. Chicago, M. & St. P. Ry. Co., 190 Iowa 509, 175 N. W. 950, 180 N. W. 670, plaintiff's decedent was a guest. Both he and the driver of the car in which he was riding were killed. This court held an instruction proper on the instinct of self-preservation. It was pointed out also that defendant's train was exceeding the speed limit and that it was for the jury to say whether both decedents might have thought they could cross in safety ahead of it.

It is difficult to see how the question of contributory negligence could have been involved in the case of Davitt v. Chicago G. W. Ry. Co., 164 Iowa 216, 145 N. W. 483. Plaintiff's ward, "a little boy," was riding with one driving a team. Whatever discussion there is of contributory negligence relates to the conduct of the driver. Facts are recited as sufficient to make a jury question that are entirely absent in the instant case. In Selensky v. Chicago G. W. Ry. Co., 120 Iowa 113, 116, 94 N. W. 272, 273, the testimony of plaintiff presented an entirely different question from the one presented here. Some quotations from the opinion may be helpful:

"But it is not, as matter of law, negligent in one approaching a highway crossing to fail to stop, *unless there are circumstances which would indicate that stopping was essential in ascertaining whether there was danger.*" (Italics supplied.)

Again: "But on the other hand, if the plaintiff knew the view to be obstructed, it would be her duty to look out for an approaching train by exercising reasonable care, in view of the obstruction; *and, under such circumstances,* it might be necessary to show that she stopped for the purpose of looking and listening." (Italics supplied.)

These six cases, especially relied upon by the majority, merely illustrate the truth of what is said in one of them:

"* * * it also often happens * * * that a comparatively slight difference in the facts of any particular case may distinguish it from another case." Lutz v. Davis, supra, 195 Iowa 1049, 1054, 192 N. W. 15, 17.

There is no showing or claim here that plaintiff was deceived or tricked by appearance into a false sense of security; and no showing that his attention was diverted from the exercise of the care required of one who enters a zone of danger. His was the burden and not defendant's. I think a verdict should have been directed for his failure of proof on the issue of contributory negligence.

HALE, MILLER, and MANTZ, JJ., join in this dissent.

WENNERSTRUM, J. (dissenting)—I am unable to concur with Division III of the majority opinion and therefore dissent therefrom. The portion of the opinion with which I disagree relates to the holding that appellee's photographic exhibits are admissible. It should be kept in mind that the accident that brought about this litigation occurred on November 26, 1941, and appellee's photographs were taken in the latter part of July 1942. Appellants objected to the admissibility of these exhibits because, it was claimed, the conditions shown by the photographs were not the same, or substantially the same, as they were at the time of the accident. In making the offer of these exhibits, counsel for appellee sought to qualify them by excepting from the photographs foliage on the trees and weeds and a car located near the last house on the north side of the street. I am not concerned about the fact that certain automobiles were shown in appellee's exhibits, about which the majority opinion makes considerable comment. What does concern me is the holding of

this court that will make possible the admissibility of exhibits that should be held entirely inadmissible by the making of certain exceptions in their offer.

The photographer testified on cross-examination that he did not see the crossing and the grounds thereabout on November 26, 1941, and that he could not tell how the conditions shown by the photographs taken by him actually compared with the conditions that existed at the time of the accident.

The appellee's exhibits show a heavy growth of verdant weeds and underbrush at and near the crossing and particularly about the railroad buildings. The appellants' photographs that were taken two days after the accident do not show any such luxuriant growth of weeds and underbrush. It is true that in the appellants' photographs there are shown some weed stalks that are apparently wilted and dry, but they are a considerable distance from the crossing and back of the railroad buildings. But these stalks of weeds do not, by the furthest stretch of one's imagination, indicate a similarity to the growth of weeds shown in appellee's photographs. It is unfortunate that the several photographs presented by the respective litigants cannot be shown in these opinions, inasmuch as I feel certain that the bench and bar of this state would be interested in observing just how far this court is disposed to go in making admissible photographs taken eight months after an accident, when physical conditions have materially changed. Appellee's Exhibit M shows such a growth of weeds that the railroad buildings are virtually obscured from view, yet the majority opinion states it is admissible because of the exception made in the offer. The majority opinion also holds that because Borcherding senior stated that appellee's photographs showed substantially the conditions at the time of the accident their value as evidence was a matter for the jury's determination. I do not think this should be the law. It is of interest to compare appellee's Exhibit M with appellants' Exhibit No. 6. These two pictures were taken from approximately the same point; one was taken two days after the accident and the other was taken eight months thereafter. They are as different as day is from night. Appellee's other photographs show weedy growths but not to the same extent as is shown by appellee's Exhibit M.

Borcherding, the real party in interest, in his testimony in chief, admits that the conditions shown by one of appellee's photographs were different than when the accident occurred. He testified:

"Exhibit M shows conditions different than the view that I had the day of the accident. I suppose the picture, Exhibit M, was taken when everything was green and the difference is in the weeds."

The general rule as to the admissibility of photographs is found in 32 C. J. S., Evidence, 620, section 715, where it is stated:

"Before a photograph may be admitted into evidence, it must be shown by extrinsic evidence to be a true and faithful representation of the place or subject it purports to represent as it existed at a time pertinent to the inquiry; and if for any reason it does not appear to represent the subject or condition existing at such time in such a way as to be instructive it may be excluded. Thus, where the appearance and condition of subjects or places at a certain time are sought to be shown, photographs taken after their appearance and condition had materially changed are generally inadmissible, and if, by reason of the susceptibility of the subject to change and the lapse of time involved, it appears likely that the condition is not the same, the photograph is not admissible in the absence of proof sufficient to negative that likelihood or to show that no change had actually occurred."

The basis on which photographs of locations which have been changed are admissible is further commented upon in the foregoing citation, at page 623, where it is stated:

"The fact that there have been changes in conditions, including even substantial changes, will not necessarily exclude a photograph where the changes can be and are explained, so that the photograph, as explained, will give a correct understanding of the condition existing at the time to which the controversy relates, and be practically instructive."

This is not the situation in the present litigation.

Further authority on the question as to the admissibility of photographs is found in the case of Stone v. Chicago, M., St. P. & P. R. Co., 8 Cir., Iowa, 53 F. 2d 813, 815, where it is stated:

"The proof required of the accuracy of a photograph varies with the nature of the evidence it is offered to supply. Here they were offered as a general representation of the crossing and surrounding physical conditions, as to which testimony had already been adduced * * *. They were not only a convenience for witnesses in explaining their testimony, but they were demonstrative evidence going to the physical situation of this crossing as it existed at the time of the accident, and were an aid to the jury in applying the testimony of the witnesses produced."

It has been the usual holding of this court that unless the photographs show that the conditions are the same as at the time of the accident involved in the litigation they are not admissible. In the case of Dice v. Johnson, 198 Iowa 1093, 1095, 1096, 199 N. W. 346, 347, a photograph of the scene of the accident taken one year to a day from the date of the accident was held inadmissible where there was a failure to show that the conditions were the same. In the case of Gose v. True, 197 Iowa 1094, 1096, 1097, 198 N. W. 528, 530, a photograph of an automobile involved in an accident on Armistice Day, 1921, which was taken on May 9, 1922, was held to be inadmissible where it was not shown that the photograph was taken under conditions similar to those on the night of the accident. In this last case, one of the lamps on the Gose car had been demolished in the accident and a new one had been installed and other conditions were not shown to be the same.

The question as to the admissibility of photographs on the basis that they show the condition of the location of a scene of an accident is largely within the discretion of the court. This was the holding in the case of Ingebretsen v. Minneapolis & St. L. R. Co., 176 Iowa 74, 83, 155 N. W. 327, 330, where it is stated:

"The sufficiency of the showing was a preliminary question for the court to pass upon when the photographs were offered, and the holding will not be interfered with except in clear case of abuse of discretion." (Citing cases.)

The question is then presented as to whether or not the photographs as offered by the appellee, and admitted by the

court, resulted in an abuse of discretion on the part of the trial court. I think there was such an abuse of discretion. The photographs were admittedly taken eight months subsequent to the time of the accident; they admittedly showed foliage on the trees and weeds that were not present at that time. Even though it was disclosed in the offer that the appellee excluded from the photographs the foliage and the automobile that were in some of the pictures, yet it cannot be denied that the conditions shown by these pictures must have been different from those existing at the time of the accident.

The statement made in Dice v. Johnson, supra, 198 Iowa 1093, 1096, 199 N. W. 346, 347, is quite applicable to our present situation. We there said:

"There are seasons when early frosts have destroyed the foliage before September 15th. This might have been so in September, 1917. If not, it was a simple matter to show such fact."

It is my conclusion that in admitting the appellee's exhibits the court abused its discretion. To hold that these exhibits were admissible would necessitate the overruling of our previous holdings in relation to the necessity of showing that the photographs show similarity of conditions at or about the time of an accident.

In this connection, support is found in 2 Jones on Evidence, 1938 Ed., 1097, 1101, section 581, where it is stated:

"Frequently photographs have been held to be inadmissible on the ground that they were taken at a time which was remote from that in controversy and under conditions which differed from those in dispute. * * * A photograph which is obscure and indefinite in details and which appears to have been taken after the conditions in question had changed is not admissible * * *."

A full discussion as to the admissibility of photographs taken subsequent to the time of an accident and which disclose circumstances and situations that are subject to change is found in 10 R. C. L. 1157, 1158, section 359. The comments there set forth support my contention.

It is my firm belief that the admission of appellee's photographs was an abuse of discretion on the part of the trial court and should require a reversal. The majority opinion states that "the jury was plainly told these pictures did not accurately show the condition of the foliage at the time of the collision, and could not have been misled by the fact there was foliage shown in the pictures."

It seems to me this is rather an extravagant statement in the light of the fact that it must be predicated upon the exception that appellee's counsel sought to make when he interrogated his witnesses relative to the photographs. And then, too, I would distinguish between "foliage," which is the term the majority opinion uses, and the high growth of weeds that virtually obscures the tallest railroad building. Different witnesses testified that the height of this building was from 12½ to 15 feet. It seems to me that the admission of appellee's photographs was not only an abuse of discretion but was prejudicial. The jury could hardly be expected to remember that they were to keep in mind that they were to consider these photographs with the verdant "foliage" out. The jury had these pictures before them during their entire deliberation and it is to be expected that they would be affected, influenced, and prejudiced by their consideration.

I would reverse.

MILLER, HALE, and MANTZ, JJ., join in the foregoing dissent.